**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**MICHAEL A. McDONALD,**

      **Petitioner,**

**vs.**                                      **Case No. 4:10cv428-RH/CAS**

**MICHAEL D. CREWS,**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

Petitioner Michael A. McDonald, proceeding pro se, filed a 28 U.S.C. § 2254 petition on October 3, 2010. Doc. 1. On April 6, 2012, Respondent filed an answer, with exhibits. Doc. 25. Petitioner filed a reply on May 5, 2013. Doc. 43.

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B). After careful consideration of all issues raised, the undersigned has determined that no evidentiary hearing is required for disposition of this matter. *See* Rule 8(a), R. Gov. § 2254 Cases in U.S. Dist. Cts. For the reasons stated herein, the pleadings and attachments before the Court show that Petitioner is not entitled to federal habeas relief, and the § 2254 petition should be denied.

## Relevant Procedural History

By amended information filed in the Second Judicial Circuit, Gadsden County, in case number 03-538-CFA, the State of Florida charged Petitioner McDonald with two counts, in connection with events that took place on July 10, 2003: (1) sexual battery on a child less than twelve (12) years old, while the defendant was eighteen (18) years old or older, a capital felony in violation of section 794.011(2)(a), Florida Statutes; and (2) lewd or lascivious molestation, a first degree felony in violation of section 800.04(5)(b), Florida Statutes. Doc. 25 Ex. A at 30 (amended information); *see id.* at 5 (information). The victim in both counts was T.W. Doc. 25 Ex. A. at 30.

McDonald proceeded to trial beginning on March 31, 2004, and concluding the next day. *See* Doc. 25 Exs. B and C. The victim, T.W., testified via closed circuit television. *Id*. Ex. B at 178-220. McDonald did not testify. *See id*. Ex. C at 282-83.

On April 1, 2004, the jury returned verdicts finding McDonald guilty as charged on both counts. *Id*. Ex. A at 31-32. The trial court adjudicated McDonald guilty and sentenced him to life in prison without parole on the first count, and thirty (30) years in prison on the second count, with the sentences to run concurrently. *Id*. at 37-38.

McDonald filed a motion for a new trial. *Id*. at 45-48. In the motion, McDonald argued the child victim, T.W., was permitted to testify via closed circuit television in violation of his rights and over his objection. *Id*. at 46. McDonald asserted that, during her testimony, T.W. "was sitting on the 'talking-doctor's' lap, holding her hand, and apparently receiving positive and negative reinforcement pertaining to the child victim's answers." *Id*. McDonald argued "[t]here was no discussion concerning the presence of

the 'talking-doctor' who, in effect, was a witness by proxy in that she assisted and

influenced the child victim's testimony contrary to law. Lewis v. State, 626 So. 2d 1073

(Fla. 1st DCA 1993)." Doc. 25 Ex. A at 46-47. McDonald also argued that the State

failed to disclose, in violation of Brady v. Maryland, 373 U.S. 83 (1963), the name of the

"talking-doctor" or give "any information to the defense as to the length of the child-

victim's counseling or the subjects contained within this counseling." *Id*. at 47.

On May 4, 2004, the trial court held a hearing on McDonald's motion for a new

trial. *See* Doc. 25 Ex. D. The court denied the motion. *Id*. at 18.

McDonald appealed his judgment and sentence, as well as the denial of the

motion for a new trial, to the First District Court of Appeal (DCA), assigned case number

1D04-2269. *See* Doc. 25 Ex. A at 49, Ex. E. McDonald's Initial Brief raised one point:

Whether the trial court erred by allowing T.W. to testify via closed circuit television. *Id*.

Ex. E. The First DCA affirmed the case without an opinion on July 22, 2005, with one

judge dissenting, also without an opinion. *Id*. Ex. H; *see* McDonald v. State, 907 So. 2d

521 (Fla. 1st DCA 2005) (table). The mandate issued August 9, 2005. *See* online

docket for 1D04-2269 at www.1dca.org. McDonald's counsel filed a motion to withdraw

the mandate and to issue a written opinion on August 16, 2005. *See id.* By order dated

August 30, 2005, the First DCA denied that motion. *See id.*

On September 21, 2006, McDonald, proceeding pro se, filed motion for post-

conviction relief pursuant to Florida Rule of Criminal Procedure 3.850, with a

memorandum of law. Doc. 25 Ex. Y at 1-79. McDonald raised multiple claims for relief,

including twenty-two (22) claims of ineffective assistance of counsel under Ground 1,

three (3) claims of legal error by the trial court in Ground 2, and six (6) claims alleging

due process violations in Ground 3. *Id*. McDonald also filed a supplement to his Rule

3.850 motion. *Id*. Ex. Z at 125-32. The State filed a response to McDonald's motion.

*Id*. at 133-52. McDonald filed a reply. *Id*. Ex. AA at 156-79.

On July 14, 2007, McDonald filed a motion to correct an illegal sentence

pursuant to Florida Rule of Criminal Procedure 3.800. Doc. 25 Ex. K at 1-6. McDonald

argued his sentence was illegal because section 794.011(2)(a), Florida Statutes, was

unconstitutional, and he attached a memorandum of law. *Id*. at 1. The trial court

denied the motion on September 17, 2007. *Id*. at 59. McDonald appealed to the First

DCA, and he filed an initial brief, in case number 1D07-6183. *Id*. Ex. L. The State did

not file an answer brief. *Id*. Ex. M. On July 18, 2008, the First DCA per curiam affirmed

the case without a written opinion. *Id*. Ex. N.; <u>McDonald v. State</u>, 989 So. 2d 641 (Fla.

1st DCA 2008) (table). McDonald filed a motion for rehearing, which the court denied.

Doc. 25 Exs. O and P. The mandate issued September 24, 2008. *Id*. Ex. Q.

On July 19, 2007, McDonald filed in the First DCA a "petition for new appeal"

alleging ineffective assistance of appellate counsel and raising five grounds. Doc. 25

Ex. I. The case was assigned number 1D07-3839, treated as a petition alleging

ineffective assistance of appellate counsel, and denied on the merits on August 13,

2007. *Id*. Ex. J; <u>McDonald v. State</u>, 963 So. 2d 304 (Fla. 1st DCA 2007).

Also on July 19, 2007, McDonald filed in the state post-conviction trial court a

motion to withdraw or dismiss his supplement to his Rule 3.850 motion, and proceed on

his motion as originally filed. Doc. 25 Ex. AA at 181. McDonald also filed a motion

requesting the appointment of counsel to assist him at the evidentiary hearing.  *Id*. at

183.  The trial court granted these motions and appointed counsel to represent

McDonald.  *Id*. at 186, 189.  The trial court rescheduled the evidentiary hearing, which

ultimately took place on June 16, 2008.  *See id.* Ex. BB; *see also id.* Ex. AA at 187,

196.

On the state post-conviction trial court entered a

non-final order, on April 14, 2008, partially denying McDonald's Rule 3.850 motion and

limiting the issues for the hearing.  *Id*. Ex. AA at 197-98.  The court found:

> [A]ll of the grounds and multiple "claims" that are contained within the
> grounds, save one, are legally insufficient and either fail to state a legal
> basis for relief, or are contrary to the record, or are conclusory, or are
> redundant, or could have been, should have been or were raised on direct
> appeal, or are alleged trial judge errors and not appropriate subjects for
> post conviction relief, or clearly involve tactical decisions by defendant's
> trial attorney.  Moreover, even if the claims were legally sufficient, the
> defendant has failed to demonstrate prejudice, that is, has failed to allege
> and demonstrate that the outcome of the trial would have been different.
> *See* Preston v. State, 970 So. 2d 789 . . . (Fla. 2007) and Strickland v.
> Washington, 466 U.S. 668 . . . (1984).

*Id*.  The court limited the issue at the hearing "to whether or not trial counsel, John

Eagen, was ineffective due to alleged incapacity after having suffered seizures in the

days immediately preceding the defendant's jury trial."  *Id*. at 198.

On May 8, 2008, McDonald filed an Unequivocal Demand for Self-

Representation, in which he requested the court "to recognize his absolute right to

represent himself" and allow appointed counsel to remain as co-counsel and assist him.

*Id*. at 199.  By order dated May 15, 2008, the trial court granted McDonald's motion to

represent himself and denied the request to designate appointed counsel as co-

counsel.  *Id*. at 201.  The court removed appointed counsel from the case and relieved

him from any further responsibility.  *Id*.

McDonald then filed a motion for rehearing and clarification concerning the April

14, 2008, non-final order.  *Id*. at 202-04.  McDonald requested clarification as to why his

claims were legally insufficient and he asserted that he was entitled to amend his Rule

3.850 motion to correct any legal insufficiencies.  *Id*. at 202.  The trial judge wrote "no

judicial action required," and initialed it on May 16, 2008.  *Id*.; *see* Doc. 25 Ex. BB at 3.

On May 31, 2008, McDonald filed a petition for writ of prohibition in the First

DCA, assigned case number 1D08-2832, asserting the post-conviction trial court erred

by failing to allow him the opportunity to amend his claims and present them at the

evidentiary hearing.  Doc. 25 Ex. W.  On July 8, 2008, the First DCA denied the petition

with a citation to <u>English v. McCrary</u>, 348 So. 2d 293 (Fla. 1977).  Doc. 25 Ex. X.

On June 8, 2008, McDonald also filed in the First DCA a petition for writ of

mandamus.  Doc. 25 Ex. R.  In this petition, assigned case number 1D08-2634,

McDonald challenged the post-conviction trial court's refusal to rule on his motion for

rehearing or clarification.  *Id*.  The State filed a response, explaining that McDonald's

motion concerned a non-final order, and a final order had not yet been entered.  *Id*. Ex.

U.  On August 8, 2008, the First DCA denied the petition on the merits.  *Id*. Ex. V.

When McDonald filed the mandamus petition in the First DCA, he also filed a

request for a stay of proceedings in the state post-conviction trial court.  *Id*. Ex. AA at

219-20.  The trial court denied that motion by order dated June 5, 2008.  *Id*. at 221.

McDonald then filed a motion to disqualify the state post-conviction trial court judge from further consideration of the case. Doc. 25 Ex. AA at 223-25. The court denied that motion on June 16, 2008. *Id*. at 226. McDonald appealed this order to the First DCA, where it was assigned case number 1D08-4097, and he filed an initial brief. *Id*. at 232; *see id*. Ex. CC. The First DCA redesignated the appeal as a petition for writ of prohibition by order dated September 22, 2008, and denied it on the merits by opinion filed October 28, 2008. *Id*. Exs. GG, HH.

Meanwhile, on June 16, 2008, the court held the evidentiary hearing on claim 21 of McDonald's Rule 3.850 motion. Doc. 25 Ex. BB. At the outset of the hearing, McDonald asserted that he should be permitted to amend his Rule 3.850 motion pursuant to Spera v. State, 971 So. 2d 754 (Fla. 2007). *Id*. at 3-6. The court indicated Spera should not apply to this case because Spera does not apply retroactively. *Id*. at 5-6. McDonald then filed another motion to disqualify the judge, which was denied. *Id*. at 7. McDonald told the court he was not prepared because the court had not ruled on his request to have experts assist him in preparing and arguing his claims concerning trial counsel's head injury; he further indicated he did not know whether his attorney had subpoenaed the experts. *Id*. at 7-8. The court reminded McDonald that McDonald had made an unequivocal request to represent himself, which the court had granted. *Id*. at 8-9. The court indicated that "this is your only opportunity so I would suggest that you make your argument on the ground that I set for a hearing if you're going to make it." *Id*. at 9. McDonald indicated that, because the court had denied him the opportunity to amend his Rule 3.850 motion, "the defense is of the position that we decline to

participate in these proceedings." *Id*. at 9.  The judge reminded McDonald that "[t]oday

is the day for an evidentiary hearing on one ground" and asked whether he was going

forward or not "because otherwise you're going to lose on that ground." *Id*. at 9-10.

McDonald responded, "On that one claim, 21, I choose not to participate, Your Honor."

*Id*. at 10.  The judge indicated if he did not go forward, he would waive that claim.  *Id*. at

11.  McDonald said he did not wish to waive the claim and reiterated that he had been

denied an opportunity to amend his motion.  *Id*. at 11-12.  The following then transpired:

> THE COURT: You don't understand, Mr. McDonald, by not having it
> today, you're waiving it.  By not going forward today, you're waiving it, that
> claim, for all time.  We're ready, Mr. Eagen is here, everybody is ready to
> proceed.  If you don't go forward on that claim now, you're waiving that
> claim for all time, do you understand?
>
> THE DEFENDANT: I understand, Your Honor.
>
> THE COURT: Is that what you want to do?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: Okay.  That's fine with me.

*Id*. at 12.

On October 31, 2008, McDonald filed a petition for writ of mandamus in the

Florida Supreme Court, asking the court to declare section 794.011(2)(a), Florida

Statutes, unconstitutional.  Doc. 25 Ex. II.  On February 19, 2009, the Florida Supreme

Court denied the petition as procedurally barred.  *Id*. Ex. JJ; McDonald v. State, 1 So.

3d 172 (Fla. 2009).

McDonald also filed a petition for writ of certiorari in the U.S. Supreme Court, in

December 2008.  Doc. 25 Ex. KK.  He presented five issues, including whether section

794.011(2)(a), Florida Statutes, was facially unconstitutional. *Id*. On February 23, 2009, the U.S. Supreme Court denied the petition. *Id*. Ex. MM.

Meanwhile, in November 2008, McDonald filed in the state post-conviction trial court another motion for leave to file an amended Rule 3.850 motion, which the court granted. *See* Doc. 25 Ex. OO at 75. Accordingly, on January 21, 2009, McDonald filed an amended Rule 3.850 motion, raising seven (7) grounds. Doc. 25 Ex. NN at 1-43. The State filed a response, and McDonald filed a reply. *See id*. Ex. OO at 79-103 (State's Response); Ex. RR at 299-313 and Ex. SS at 314-28 (Defendant's Reply). On August 28, 2009, the state post-conviction trial court entered an order summarily denying McDonald's amended Rule 3.850 motion. *Id*. Ex. SS at 331-33.[1]

McDonald appealed the denial of his amended Rule 3.850 motion to the First DCA and filed a brief, in case number 1D09-6506. Doc. 25 Ex. BBB. The State did not file an answer brief. *Id.* Ex. CCC. The First DCA per curiam affirmed the case without an opinion on July 2, 2010. *Id*. Ex. DDD; *see* McDonald v. State, 43 So. 3d 697 (Fla. 1st DCA 2010) (table). McDonald filed a motion for rehearing. Doc. 25 Ex. EEE. The First DCA denied that motion on September 15, 2010. *Id*. Ex. FFF. The mandate issued October 1, 2010. *Id*. Ex. GGG.

As indicated above, on October 3, 2010, McDonald filed a § 2254 petition in this Court. Doc. 1. Respondent filed a response, with exhibits. Doc. 25. McDonald has filed a reply. Docs. 43, 43-1.

---

[1]This order was entered by a successor judge to the judge who presided over the June 2008 evidentiary hearing.

## Analysis

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective

Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for

persons in state custody.  In pertinent part, § 2254 provides:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d).  The phrase "clearly established Federal law" refers to "the

governing legal principle or principles set forth by the Supreme Court at the time the

state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).  "A

state court decision is 'contrary to' clearly established federal law if either (1) the state

court applied a rule that contradicts the governing law set forth by Supreme Court case

law, or (2) when faced with materially indistinguishable facts, the state court arrived at a

result different from that reached in a Supreme Court case."  Putman v. Head, 268 F.3d

1223, 1241 (11th Cir. 2001).  A state court decision constitutes an "unreasonable

application" of clearly established federal law if it: (1) "identifies the correct legal rule

from Supreme Court case law but unreasonably applies that rule to the facts of the

petitioner's case," or (2) "unreasonably extends, or unreasonably declines to extend, a

legal principle from Supreme Court case law to a new context." *Id*.

In this case, in his § 2254 petition, McDonald raises nine grounds:

(1) Section 794.011(2)(a), Florida Statutes, is facially unconstitutional and McDonald's sentence is illegal, doc. 1 at 4-5;

(2) McDonald was denied effective assistance of counsel at trial, due process, equal protection of the law, fair notice, and fair trial contrary to the U.S. Constitution, where trial counsel was ineffective for failure to move to nol pros or discharge McDonald of an unlawfully amended information, and the trial court had no jurisdiction to proceed and enter judgment and sentence, *id*. at 5-6;

(3) Trial counsel was ineffective due to incapacity from head injuries, *id*. at 7;

(4) Ineffective assistance of counsel (IAC) for failure to object to impermissible cumulative hearsay and failure to move to exclude the same, *id*. at 8-9;

(5) IAC for failure to contact experts to determine the potential value of their testimony, failure to present expert witnesses to refute the State's allegations at trial, and failure to call McDonald's wife as an important fact witness, *id*. at 9-11;

(6) IAC for failure to impeach the State's witnesses and failure to move to disqualify and exclude their testimony, *id*. at 11-13;

(7) IAC for failure to object to prosecutorial misconduct, *id*. at 13.

(8) IAC due to cumulative effect of trial counsel's errors and counsel was additionally ineffective for failure to move for a judgment of acquittal (JOA) or submit a more artfully presented motion for JOA alleging insufficiency of the evidence and the failure of the State to satisfy the corpus delicti requirement of proof beyond a reasonable doubt, *id*. at 14-15;

(9) McDonald's right to confrontation and fair trial were violated where the trial court allowed T.W. to testify via closed-circuit television over McDonald's objection, *id*. at 16-17.

Respondent asserts that McDonald's § 2254 petition appears timely.  Doc. 25 at 44.

Respondent also asserts that McDonald's claims, to the extent they were presented to

the state courts, were all adjudicated on the merits and the Florida courts' decisions do

not contravene or unreasonably apply U.S. Supreme Court precedent.  *Id*. at 41-42.

Respondent further asserts that, as to Grounds 3, 4, 5, 6, 7, and 8, McDonald

did not properly exhaust these claims because he did not sufficiently raise them on

appeal from the denial of his Rule 3.850 motion.  Doc. 25 at 59, 67, 75, 86, 99, 108.

Respondent points out that McDonald simply listed each claim in the table of contents

of his brief and this does not constitute proper pleading.  Thus, Respondent argues

McDonald did not satisfy the exhaustion requirement and is now procedurally barred

from raising these claims in his § 2254 proceeding, and further McDonald has not

shown cause or prejudice to overcome the bar.  Doc. 25 at 62, 72, 79, 92, 102, 111-12.

As an initial matter, McDonald's brief filed in the First DCA, though bare-bones,

did list his IAC claims under the first point, as Respondent acknowledges.  *See* Doc. 25

Ex. BBB at ii.  In addition, McDonald asserts in his brief that "[t]he legal basis for relief

of McDonald's 3.850 issues is well established in his Amended Motion and Reply to

State's Response."  *Id*. at 1.  He, in effect, adopts those arguments in his brief as he

indicates he "would not burden this Court with unnecessary repetition, and thus

advances this Brief solely to provide additional information" the court may find useful.

*Id*. at 1-2.  In his brief, he stated that all his claims "are federal in caliber, involving

substantial deprivation of his constitutional rights, and should be given due

consideration."  *Id*. at 2.  He also pointed out that no evidentiary hearing had taken

place in the state post-conviction trial court on his amended Rule 3.850 motion. *Id*.

Therefore, contrary to Respondent's argument concerning exhaustion, it appears

McDonald did sufficiently present his arguments on appeal from the denial of his

amended Rule 3.850 motion. *See generally* Henry v. Dep't of Corr., 197 F.3d 1361,

1368 (11th Cir. 1999) (holding that where petitioner raised two IAC claims in Rule 3.850

motion, which was summarily denied, and on appeal, petitioner alleged error based only

on failure to hold evidentiary hearing, state court appeal sufficed to exhaust petitioner's

IAC claims in state court for purposes of § 2254).

McDonald's claims are addressed individually below, beginning with the first and

last grounds, followed by the remaining grounds, all of which allege IAC claims.

Because McDonald's claims do not warrant federal habeas relief, his § 2254 petition

should be denied on the merits.

**Ground 1: Section 794.011(2)(a), Florida Statutes, is Facially Unconstitutional**

In the first ground, McDonald argues the statute under which he was charged

and convicted, section 794.011(2)(a), Florida Statutes (2003), is facially

unconstitutional. Doc. 1 at 4. McDonald further argues his sentence is illegal because

sexual battery of a child under twelve (12) years old is a capital felony for which the

death penalty cannot be imposed. *Id*.

In response, Respondent expressly asserts and declines to waive any applicable

defense or procedural bar. Doc. 25 at 28. Respondent further argues McDonald's

claim that the statute is unconstitutional lacks merit. *Id*. at 49; *see* Batie v. State, 534

So. 2d 694 (Fla. 1988). In addition, Respondent points out that McDonald received a

life sentence, not the death penalty; therefore, U.S. Supreme Court precedent was not

violated.  Doc. 25 at 50; *see* <u>Kennedy v. Louisiana</u>, 554 U.S. 407 (2008).

Respondent's points are well-taken.  Although the crime at issue is "capital

sexual battery," it is not a capital offense because it is not subject to the death penalty.

*See* <u>Buford v. State</u>, 403 So. 2d 943 (Fla. 1981) (holding that death cannot be imposed

for sexual battery of child); *see also, e.g.*, <u>Huffman v. State</u>, 813 So. 2d 10, 12 (Fla.

2000) (explaining "even if a felony is classified in the Florida Statutes as a capital

offense, it is not 'capital' under case law unless its subject to the death penalty"); <u>State</u>

<u>v. Hogan</u>, 451 So. 2d 844, 845-46 (Fla. 1984) ("Sexual battery of a child, therefore,

while still defined as a 'capital' crime by the legislature, is not capital in the sense that a

defendant might be put to death.  Because the death penalty is no longer possible for

crimes charged under subsection 794.011(2), a twelve-person jury is not required when

a person is tried under that statute.").  The statute at issue, section 794.011(2)(a),

Florida Statutes (2003), proscribing capital sexual battery, which is punishable by life in

prison without the possibility of parole, is not unconstitutional and McDonald's sentence

is not illegal.  *See* <u>Adaway v. State</u>, 902 So. 2d 746 (2005) (holding defendant's

sentence of life in prison without parole for violating section 794.011(2)(a) not

unconstitutional).  Accordingly, this ground should be denied.

### Ground 9: Violation of Rights to Confrontation and Fair Trial by Allowing T.W. to Testify Via Closed-Circuit Television

In Ground 9, McDonald argues his rights to confront witnesses and a fair trial

were violated when the state trial court allowed the victim, T.W., to testify via one-way

closed-circuit television. Doc. 1 at 16. McDonald asserts that the testimony presented

to the court, just prior to trial, by the State's expert witness, Dr. Knobbe, failed to

establish the required likelihood of mental harm to T.W. as a direct result of having to

testify in McDonald's presence. *Id*. McDonald asserts the trial court failed to make the

requisite case-specific findings on the record and instead made only general findings as

to why T.W. would suffer harm. *Id*. McDonald argues the trial court's ruling failed to

satisfy the legal requirement and resulted in a decision contrary to the U.S. Constitution,

depriving him of his fundamental rights to confrontation and a fair trial. *Id*. McDonald

also argues that without T.W.'s closed circuit testimony at trial, her hearsay statements

offered by her mother, neighbor, and Kimberly Ellis, would not have been admissible,

and the State's case would have failed due to insufficient evidence. *Id*. at 16-17.

Respondent points out that McDonald raised this claim in his direct appeal. Doc.

25 at 116. Respondent argues, on the merits, that the state court's ruling was not

contrary to or an unreasonable application of U.S. Supreme Court precedent. *Id*. at

117. Respondent explains that, in <u>Maryland v. Craig</u>, 497 U.S. 836 (1990), the Court

approved the use of one-way closed circuit television for a child victim to testify in child

abuse cases, where the trial court finds the emotional distress that would be suffered by

the child witness in the presence of the defendant is more than de minimis. Doc. 25 at

118-19. In this case, Respondent asserts that Dr. Knobbe opined there was a

substantial likelihood T.W. would suffer at least moderate mental or emotional damage

if she was forced to confront McDonald in open court. Respondent indicates that, in

granting the motion to allow T.W. to testify via closed-circuit television, the court made a

finding on the record that "there is a substantial likelihood that she would suffer at least moderate emotional or mental harm due to – if she's required to testify in the presence of the defendant in open court."  Doc. 25 Ex. B at 38.  Therefore, according to Respondent, McDonald is not entitled to relief.

As an initial matter, as Respondent indicates, McDonald argued in his direct appeal to the First DCA that the trial court erred in allowing T.W. to testify via closed-circuit television.  *See* Doc. 25 Ex. E.  The First DCA affirmed without an opinion, with one judge dissenting.  *Id*. Ex. H.  McDonald's appellate briefs cited only Florida state cases and statutes, with the exception of one string cite that included the Sixth and Fourteenth Amendments to the U.S. Constitution.  *See id*. Ex. E at ii, 8, 9 (string cite); Ex. G.  The State's answer brief did cite to federal law, including Craig.  *See id.* Ex. F at 14.  Because McDonald included one set of citations to the U.S. Constitution and the state case law relied on in his briefs discussed the constitutional right to be confronted with the witnesses against him, such as Hopkins v. State, 632 So. 2d 1372 (Fla. 1994), and Lewis v. State, 626 So. 2d 1073 (Fla. 1st DCA 1993), McDonald at least arguably "fairly presented" his federal claim to the state court.  *See* Lucas v. Sec'y, Dep't of Corr., 682 F.3d 1342, 1352-53 (11th Cir. 2012).

A review of the record reflects that, on the morning of trial, March 31, 2004, just before the trial started, a hearing took place regarding a motion filed by the State the previous day, for closed-circuit camera testimony from the victim, T.W., pursuant to section 92.54, Florida Statutes (2003). *See* Doc. 25 Exs. A at 23-24 (motion), B at 4-40. The prosecutor, Francis Allman, stated that Dr. Thomas Knobbe was "in my office now,

talking with the victim T.W. to ascertain if she would suffer the requisite mental and

emotional harm that is required for use of that statute to allow the testimony." *Id*. Ex. B

at 4.  The trial judge asked defense counsel to respond, and defense counsel stated:

> Yes, Your Honor.  Well, I'm somewhat upset and taken aback that the State has called Dr. Knobbe to interview this child and to appear, we assume, to offer expert testimony on behalf of the State with no notice to us of their intent to have the child seen by Dr. Knobbe and having us to have no ability to have our own expert interview the child to determine whether or not there was trauma.  This case happened back in July of 2003, and you're gonna tell me that now, the day of trial, they are finally getting this child to see a counselor or to see someone to see if there was trauma?  And then, too, they're gonna bring in that expert to testify, when we've had no opportunity to depose the expert, no opportunity to obtain an expert of our own to interview this child?  I mean, I think that's totally unfair to Mr. McDonald.
>
> You viewed the tape [made by the Child Protective Team (CPT)], Your Honor, and I have viewed the tape.  I don't see – I didn't see any evidence of trauma during that interview.  The evidence I think that I received through discovery was that, allegedly, after the child made the disclosure to the neighbor [Leshone Davis], she ran back and was in the care of the – given right back to the – to Mr. McDonald.  And after the child talked to the mother, the child sat down and was eating dinner with Mr. McDonald until the mother left with the child to go to another home.
>
> I'm opposed to, you know, to this whole – I reviewed the information provided to me by the State.  I think Lewis v. State, which seems to be the primary case in this issue, requires a finding – a substantial finding that this child is gonna experience trauma.  And to have Dr. Knobbe come in here at the ninth hour, the day of trial, to offer expert testimony and his opinion as to the trauma of this child, I think that's totally unfair to Mr. McDonald.  And if that's their intent, I would like to know why the State has waited until the last minute to do this.  Up until last week, when I discussed this case with Mr. Allman, we discussed the child appearing in court, testifying, having to clear the courtroom for the testimony.  And suddenly now, on the day of trial, suddenly there's this concern of trauma?  I'm sorry, Your Honor, but, you know, I'm – I'm all for trying to fight a case as well as anybody else, but I think this is just – this is last minute and, excuse the expression, but I feel like I'm being

blindsided here.  I don't feel that this is fair, and I don't think this is gonna give Mr. McDonald an opportunity to be heard.

I understand that the Supreme Court has found that interviewing a child – or testifying by closed circuit TV does not prohibit or does not violate his confrontation, but Your Honor, putting this child on TV is gonna limit my ability to cross examine her because she's not gonna be up on the stand.  It's gonna be – eliminate my – you know, the demeanor or the – of what the jury's gonna see of this child on the stand.

And what if the child comes into this courtroom and has no reaction to Mr. McDonald at all?  Well, I think that's a – that's something the jury should be able to see as well.

I just think that this is a terrible mischaracter [sic] of procedure here, that here on the ninth hour we're suddenly being hit with Dr. Knobbe as an expert coming in and testifying here concerning trauma.  Whether it's in camera or not, Your Honor, I think it's unfair.  And at the very least, if that's what they intend to do, then we would seek to get our own expert and have this child examined by that expert.  I mean, I think we're entitled to that.  Or to get his report or to see what he's get [sic] basing it on.

*Id*. at 5-7.  The trial judge asked the prosecutor to respond and the following transpired:

MR. ALLMAN: Judge, Dr. Knobbe is not gonna testify in the case-in-chief.  The only thing he's going to do is offer some testimony about his opinion as to whether the child would suffer from the emotional and mental harm that's talked about in the statute.  I don't even know what Dr. Knobbe's gonna say.  He's back there talking to the child right now.  He may come in here and say that she would be fine, in which case we wouldn't have the finding to be made by the Court.  If he says that the child would suffer the harm, then obviously we would seek to go for the closed circuit camera testimony.

Now, there's been a concern all along – This is not the child's counselor, so to speak.  I mean, this is not something that we're just doing at the last minute to see if there's any trauma.  The issue for Dr. Knobbe, and the issue before the Court, is whether the child being face-to-face with the defendant in this courtroom, here today, is going to cause her the substantial likelihood of emotional or mental harm.  That's what Dr. Knobbe is here to talk about.

I think it would be fair for the defense to have a chance to voir dire Dr. Knobbe and to state their objections for the record, but he's not going to testify in the case-in-chief. I would expect his testimony to be fairly directly to that one point.

MR. EAGEN [defense counsel]: Well, Your Honor, only one other point. In the very initial states of this case, when this child was interviewed by Kimberly Ellis and then was seen by the Department of Children and Families case workers and then Faye Gardner did an evaluation of this child to determine whether or not any dependency issues were arising, her recommendations were, at that time, that since the – since Mr. McDonald was not gonna be around the child, there was gonna be no contact at that time, that, you know, they didn't see a dependency issue. But her recommendation specifically stated that the child should receive counseling as needed.

Now, if there was – if there was trauma, then this child should have been seeing a counselor all this while, and we would have a counselor that would come in here and could adequately, after seeing the child for a period of months, give an opinion. And we would have been – If we had known about that prior to today, then we would have been prepared to do that.

Now, if – Also, if Mr. Allman had made me aware that this was his intention, instead of that the child was gonna testify, then I probably would have scheduled the child for a deposition and done a video deposition to allow me to actually confront the child person-to-person. But none of that was done, and this is just – I just –

THE COURT: Well, let me interrupt you a minute. This statute – I don't think anybody is being sandbagged here, because there is no time constraints in the statute. As a matter of fact, it gives the Court the option of saying, "We're gonna do this closed circuit TV," does it not? Yes, it does.

MR. EAGEN: Yes, it does. Absolutely. You make the finding, that's correct.

THE COURT: Now, what defense counsel is saying is we don't want the Judge or the Court to have any help in making that determination. And if that's what you want, fine, I will talk to the child myself and make that determination. Now, as far as video depositions and confrontation, I believe, counsel, in your argument you already agreed that the Supreme

Court has ruled that the right of confrontation is not abridged through television testimony.

MR. EAGEN: That's true, I do.

THE COURT: Right.

MR. EAGEN: I do. I understand that.

THE COURT: So you can't say: Well, we can't have it now, but boy we should have had it before. No. Now, Dr. Knobbe is – I don't know what he's gonna say, I don't think anyone knows what he's gonna say. I do not – If he was testifying in the case-in-chief, that would be a different story, but he is not. He's testifying on a very narrow issue, whether or not the child would be traumatized or have any – suffer in any way from appearing in the courtroom to testify in the presence of Mr. McDonald. That's the sole issue, correct?

MR. EAGEN: That is.

MR. ALLMAN: Yes, sir.

THE COURT: And we're gonna hear from Dr. Knobbe on that point, Mr. Eagen.

MR. EAGEN: Oh, I understand that. I'm voicing my objection.

THE COURT: Your objection is noted.

*Id*. at 8-11.

After Dr. Knobbe finished his examination of T.W., he testified, outside the presence of the jury, concerning the State's motion to have T.W. testify via closed circuit camera. *Id*. at 17-35. He testified that his training is as a clinical child psychologist, a "substantial amount" of his work is with the CPT or the Department of Children and Families, and the rest of his practice is therapy with children having emotional difficulties. *Id*. at 18. Dr. Knobbe indicated he gets referred to "as kind of the

'listening doctor,' or the 'worry doctor,' is what kids call [him]." *Id*. Defense counsel

stipulated to Dr. Knobbe's expertise. *Id*. at 19.

Dr. Knobbe testified he was contacted the day before, by Faye Gardner with the

CPT and, in response, he had come to the prosecutor's office that morning to meet with

T.W. *Id*. He met with T.W. for "[a]pproximately an hour" and he believed that time was

sufficient for him to make a determination within a reasonable degree of psychological

certainty, regarding whether T.W.'s appearance in court, in a face-to-face confrontation

with McDonald, would cause a substantial likelihood of mental or emotional damage.

*Id*. at 20. Dr. Knobbe described his interview methodology:

> Well, first we took a little time to get to know each other. She picked out
> some books for me to read, and we watched a little bit of a Disney tape so
> she could just get comfortable with me. And then I explained my reason
> for wanting to talk to her. The rest of the interview involved drawing some
> – basically faces that show different basic mood states, and then just
> question and answer, asking her questions about her understanding about
> what she would be called upon to do and how she feels about it and how
> she would feel in different situations. I also addressed the issue about
> whether she understands the difference between telling the truth and
> telling a lie, to make sure that she understands, you know, that, the
> concept and the importance of being truthful.

*Id*. at 20-21. Dr. Knobbe testified that "it's clear that she understands that, what it is to

be truthful and that it's important to be truthful." *Id*. at 21. His testimony continued:

> Q All right. And based on your interview, then, with [T.W.], what is your
> opinion about whether she would suffer a substantial likelihood of at least
> moderate mental or emotion damage if confronted – or I should say
> forced to confront the defendant in this case, face-to-face in open court?
>
> A  I believe that she would.
>
> Q Can you tell us why?

A Several – Several different kinds of information.  One was the fact that she was very, very sensitive to the presence or absence of her mother at all times during our interview.  She was checking to see if her mother was in the same room, she was closely listening to whether her mother was speaking about her or not.  At one point her mother left the room and she became very quiet and said she wanted her mommy.  At the end of our interview then, when I left to come over here and her mother was still absent, she became quite tearful and said she wanted her mother.  So what that indicates to me in a child this age is an increase in what we call attachment related behavior and feelings of insecurity in the absence of her mother, so she's already in a, in essence, a heightened emotional state and a state of insecurity to start with.

In addition, she is very reluctant to talk about, very much tries to avoid talking about feelings about coming to talk this morning, but in fact any negative feelings in generally, she generally holds to – to – she presented to me like a child who's putting up a very brave front.  When I interview her about different kinds of feelings, what makes you happy, what makes you sad and the like, the only feelings that she would really admit to are happy feelings, although she did state that if she were to see the – well, Michael, who she referred to as Michael, who I believe is the defendant, that she would feel anger, she would feel mad.  "Mad" was her word.

Q All right.  Well, let me ask you: Does the fact that [T.W.] is about five years old have any factor in the calculus about whether she would suffer the damage that we're talking about?

A It has a significant role to play.  I was thinking about that as I was walking over here, and just mulling over and making sense of the interview we'd had.  And I recall from having reviewed several chapters on this subject last night, that preschools tend to process – they make sense of situations based on their immediate experience of it.  They don't really – they really can't think abstractly or they can't think about situations they haven't experienced.  It's very hard for them to understand the roles of different individuals in a courtroom setting.  So while she may know that there are different people who have different roles such as a Judge, lawyers, court reporters, juries, and the like, it's hard for her to really understand their roles and she may process and think of this situation in terms of what she's already experienced.

Now, I haven't – I wasn't able in the time I had to establish sort of what's her frame of reference, whether it's something like having to go to

the principal's office or something like that, but it's clear that she has – that this particular child has a limited understanding of what is everybody's role and what would be her role and what she would have to do.

Q  And in addition to the anger that she talked about, did she express any feelings of fear or trepidation or being afraid of Mr. McDonald if she had to see him face-to-face?

A  She did not.

Q  Okay.  Now, what about the fact that this is a family situation?  The defendant in this case is actually the husband of Ms. [T.W.]'s older sister.  Does that have any affect on the likelihood that she would suffer mental or emotional harm?

A  I wasn't able to discuss specifically with her that issue, however it is generally acknowledged in the literature that sexual abuse which takes place within a family setting, and having to report and answer questions, testify to such, is generally more stressful for children than having to report such abuse when it takes place at the hands of strangers.

Q  Did she – Did you have a chance to discuss with her any feelings that she has of concern that her testimony is going to break up her family or somehow cause any kind of problems within the family unit?

A  No.  I did attempt to start questioning along those lines, but she basically became quiet and went back to her drawing at that point.  She generally avoided that topic.

. . . .

Q . . . . Describe for us the way that [T.W.] behaved whenever you approached the issue of having to confront Mr. McDonald here in the courtroom.

A  Oh, she would stand very straight, her expression, her facial expressions became much more flat, or as you would say sort of difficult to read, and she became very intent on doing – doing something.  Either she was printing letters on a piece of paper, or at one point she removed the video that was in the – that was playing in the TV set and switched to another video.

Q  Okay.

A In essence, just about anything other than responding to the question.

Q And if confronted, then, in a face-to-face situation with her accuser, would you expect that to be a less intensive reaction or a more intensive reaction?

A I would expect a more intensive reaction, again along those lines of trying to avoid having to think about, deal with, respond to the situation.

Q And just to wrap up, after your hour-long, or approximately hour-long meeting with her, it's your expert opinion, to a reasonable degree of psychological certainty, that [T.W.] would suffer at least a substantial likelihood of mental or emotional harm, at least moderate mental or emotional harm if she were forced to confront Mr. McDonald here in open court?

A Yes.

*Id*. at 26. On cross, defense counsel asked Dr. Knobbe whether he had reviewed the

CPT taped interview with Kimberly Ellis, and Dr. Knobbe indicated he had not done that

– his opinion was "strictly based on the time I spent with [T.W.] this morning." *Id*.

Defense counsel questioned Dr. Knobbe about whether he knew T.W. "has basically

been raised by the mother, and the father is not in the house," and Dr. Knobbe

responded, "I really have not – like I say, I have not reviewed the case, any of those

sets of demographics – . . . you know, to establish, for example, what was her prior

relationship with her mother who's reared her, or the like." *Id*. at 27-28. Dr. Knobbe

indicated that it is not "abnormal" for a child to be more closely tied to a single parent

and it is "possible" that the absence of the child from that parent would increase

separation anxiety. *Id*. at 28. Defense counsel further questioned Dr. Knobbe about

trauma T.W. might experience:

Q Okay. And part of the concerns you raised were the – her inability to be – you know, the courtroom setting, and being able to understand the position of the Judge and the jury, et cetera, correct? That would be part of the trauma?

A Well, it – Yeah, what I was trying to convey is that it is important, in interpreting the responses she gave me, to understand that she is, you know, a preschooler, a kindergarten-aged child, and it is difficult for them to understand the roles of particular officials of the court. For example, she might not understand that it would be sufficient for, if she had something that she needed to convey to the defendant, that that could be conveyed through another person, such as the Judge. She might assume that for it to – for what she has to say to count, that she would have to state that directly to that person.

. . . .

Q Okay. Now, as I understood your testimony, your – your – what you stated was that it was your opinion – or that she may exhibit anger at the – at Mr. McDonald?

A That's what she reported to me, yes.

Q Or be "mad" at him, and express that?

A Yes.

Q Okay. But in answering the questions of – from the State, you did not specifically have an opinion, or she did not state anything concerning, her fear?

A That's correct, yes. No, she did not state that she would feel fearful.

Q No fear, just anger?

A Right, just anger.

Q Okay. And you are also aware that if it is done by closed circuit, this is not – Is it my understanding from your testimony that your opinion is the testifying itself would be a traumatic situation for this child?

A I believe that, yes, that it would be.

Q  Because – And some of the things that the State asked you about concerning the, you know, the relationship in the family, et cetera, and all those things, okay, those traumatic aspects of the testifying itself would not be eliminated by testifying, whether it's closed circuit or in the courtroom; is that correct?

A  That's correct, yes.

Q  So the mere basis of – The mere fact of testifying itself is a traumatic circumstance?

A  Yes.

Q  Okay.  And so if I can center the focus, if I'm understanding the concerns that you're raising, is that when she's present in the courtroom, she will experience some separation anxiety of not being with her mother, correct?

A  If her mother is not able to be with her, yes, that is correct.

Q  Right.  And we would assume also that if she's testifying by closed circuit, her mother would not be present either?

A  I assume that's for the Judge to determine.

Q  Okay, but let's – Okay, but – So there's a separation anxiety?

A  Yes.

Q  Then there's the concerns as to the aspects of the courtroom itself?

A  Yes.

Q  Which can be a scary place for anybody, correct?

A  Yes.  Frequently it is for me, yes.

Q  I understand.  And then, lastly, your opinion is that she may exhibit being mad at Mr. McDonald?

A  Yes, as she reports it.

Q  And so let me center on this aspect of being mad, okay?  How is that traumatic?

A  In itself?

Q  Yeah.

A  Being angry?

Q  Yes.

A  Oh.  It can, in itself, it can be traumatic in – if a child is living in an environment in which she believes it's not acceptable to express a lot of negative emotion –

Q  All right, but you don't know that –

A  – whether or not that is fear, anger, sadness, or the like.

Q  But you have no knowledge of that at all –

A  No.

Q  – because you don't know the family dynamics?

A  That is correct.

Q  Assuming she's being raised in a normal family – well, quote, unquote, "normal" where people do get angry, it would necessarily be traumatic, would it?

A  It may or may not be.

Q  But you can't voice an opinion on that, because you don't know the dynamics?

A  That's correct.

. . . .

Q  Going along with this anger and this madness, were you able to ascertain anything as the source of the anger, you know, for example, the source of the anger other than the possibility of the allegations in this

case?  For example, the fact that Mr. McDonald is no longer in the home, neither is her sister or her cousins present in the home?

A  Actually, I believe I was.

Q  And?

A  At the time that I was asking her, you know, how she would be – how she would feel if she saw the defendant again, this directly followed our discussion about whether if she could have a choice that she could talk to the Judge in front of the defendant or in another way, and she spontaneously stated to me that she had – she had tried to talk to the defendant and – at some point, and said, "Let's go, I don't want to play," that that he didn't listen.

I asked her, then, what difference would it make, then, to – or why would she – why was she bringing this up at this time, how did this connect with talking in front of the Judge, and she explained to me that if the Judge was there, that perhaps the Judge would be able to get Michael to listen to her and believe her when she said, "No," she didn't want to do the things he wanted her to do.  And I believe that's where some of the anger comes from, this feeling that she hasn't been listened to.

Q  But going back to what I was saying, though, did she talk at all about sher sister . . . and her – I believe it would be her cousins, who were living in the home at the time and who were no longer there since this incident occurred?

A  No, we did not discuss those relationships, other than to establish who was who.

Q  Okay.  So you can't ascertain, or you don't have any opinion as to whether some of this anger could also be based on the separation that she's had now from her sister and the other family members?

A  No.  Basically, the time I had available didn't allow that.

*Id.* at 29-34.  On redirect, the prosecutor asked if T.W.'s anger was the sole basis for

Dr. Knobbe's opinion:

Q  The fact that Miss [T.W.] expressed to you that she would feel anger toward the defendant, while that may or may not result in emotional or

mental harm to her, that fact alone isn't what you're basing your opinion on?

A  No, it is not.

Q  It's the totality of what you talked about here today?

A  Yes, the totality of what I talked about.  That in particular would perhaps cause me some concern about her ability to provide the Court with complete information.  Just about any person, when they're angry, has a little bit more difficult time searching their memory and giving complete information, but that's separate from – that's not the totality of what I based my opinion on.  It's based on all the information I have.

*Id*. at 35.  The prosecutor argued:

I would just state that the testimony of Dr. Knobbe does provide the evidence that there is a substantial likelihood that Miss [T.W.], who is the victim in this case, will suffer at least a moderate emotional or mental harm due to the presence of the defendant if the child is required to testify in open court.  I would ask the Court to make specific findings as to that and allow the closed circuit camera testimony of the victim.

*Id*. at 35-36.  In response, defense counsel argued:

Your Honor, we renew our objection, based on the opinion of Dr. Knobbe.  As I understand it, there were three factors:  The overall courtroom circumstances, which under the Lewis decision, should not – cannot be the basis for the exclusion, or the allowing of the closed circuit television; the separation anxiety from her mother, which, as Dr. Knobbe stated, unless the mother is present where she's being filmed with the closed circuit TV, there's going to be separation anxiety either way, and I don't think that should be considered as a factor here; which leads us with the sole factor that he says that she could be mad or could experience or express some anger towards Mr. McDonald.  He specifically said she didn't express any fear or anxiety in coming here, as far as Mr. McDonald, but she did say – he did say that she might express some anger.  Well, I don't think anger relates to trauma.  And if she's gonna be angry, then, you know, I don't know where that – I don't know how that relates to trauma in this particular case, especially in the Lewis decision.  I don't think it reasonably raises to the level of moderate or, you know, trauma.  Anger is not trauma.  And if the victim is angry, the victim is angry, and we don't know where that anger's coming from.  Dr. Knobbe himself says he

only had an hour.  He didn't get to understand – He didn't even know of the family dynamics as to the father, there's no father in the home, if this could be contributing to the separation anxiety.  He didn't go into the sister and the niece and nephew who are no longer – are separated due to this event.  He did not view the videotape.

I don't think that there's a sufficient finding that you – or that there should – that you can find a substantial finding that this child would be traumatized by being in this courtroom, based solely on – or based on this opinion.  If the child is going to experience anger, I don't think that's sufficient under the case law.

*Id*. at 36-37.  The prosecutor had nothing further.  *Id*. at 37.  The trial judge made his

ruling, in its entirety:

THE COURT:  All right.  Well, we've got here a five year old child.  She's a normal five year old child, but she is, nevertheless, a five year old child. That is a factor that must be considered by the Court and has been considered by the Court, together with the family relationships that exist in this entire case.  I must factor in the child's limited understanding of the court and the nature of the testimony that is to be elicited from her.  With that, I'm considering the observations that this Court did make of the child when it reviewed the CPT tape, as well as the verbal response of the child during the interview.

I find that there is a substantial likelihood that she would suffer at least moderate emotional or mental harm due to – if she's required to testify in the presence of the defendant in open court; therefore, I'm granting the motion.

MR. EAGEN: Well, Your Honor, our objection is noted for the record, I assume, as far as –

THE COURT: So noted.

*Id*. at 37-38.  Defense counsel then inquired about the logistics of the child testifying.

*Id*. at 38.  The prosecutor indicated he planned to have the video camera hooked up to

the television that is in the courtroom; the jury would remain seated in the jury box in the

courtroom; the defendant would remain seated at counsel table in the courtroom; the

court reporter would remain in the courtroom, taking the testimony off the video camera; and the judge, the prosecutor, and defense counsel would be in the jury room with T.W. *Id*. at 38-39. The defendant could communicate with his attorney via telephone. *Id*. at 39. Defense counsel requested, and was allowed, to have his paralegal in the jury room. *Id*. The court also added that one of the bailiffs would remain in the courtroom in the event any breakdown in communication occurred with the cell phone McDonald would use to communicate with defense counsel. *Id*. at 39-40. Defense counsel indicated, "That would be fine, Your Honor. Under though [sic] provisos, we can proceed." *Id*. at 40. As indicated above, the trial court's ruling was affirmed on appeal without an opinion.

From the detailed review of the record, the state court's adjudication of the claim did not (1) result in a decision that was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent; or (2) result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). In Maryland v. Craig, the applicable established U.S. Supreme Court precedent cited by McDonald and Respondent, the Court considered a Maryland procedure similar to that done in this case and held:

> [I]f the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.

497 U.S. at 855. The Court explained the findings the trial court must make:

The requisite finding of necessity must of course be a case-specific one: The trial court must [1] hear evidence and determine whether the use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify. The trial court must also [2] find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant. Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma. In other words, if the state interest were merely the interest in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present. Finally, the trial court must [3] find that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, i.e., more than "mere nervousness or excitement or some reluctance to testify."

*Id*. at 855-56 (citations omitted). The Court indicated that, in the case then before it, it

"need not decide the minimum showing of emotional trauma required for use of the

special procedure, however, because the Maryland statute, which requires a

determination that the child witness will suffer 'serious emotional distress such that the

child cannot reasonable communicate,' § 9-102(a)(1)(ii), clearly suffices to meet

constitutional standards." *Id*. at 856. The Court concluded:

[W]here necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation.

*Id*. at 857. The Court further concluded:

Because there is no dispute that the child witnesses in this case testified under oath, were subject to full cross-examination, and were able to be observed by the judge, jury, and defendant as they testified, we conclude

that, to the extent that a proper finding of necessity has been made, the admission of such testimony would be consonant with the Confrontation Clause.

*Id*. Finally, the Court considered a portion of the opinion of the Maryland Court of Appeals which had relied on Coy v. Iowa, 487 U.S. 1012 (1988), to impose two other requirements: (1) that the Maryland statute "'cannot be invoked unless the child witness initially is questioned (either in or outside the courtroom) in the defendant's presence,'" and (2) before using the one-way closed circuit television procedure, the trial judge must "determine whether a child would suffer 'severe emotional distress' if he or she were to testify by a two-way closed circuit television." *Id*. at 858 (citations omitted). The Court found these requirements not necessary:

> The Court of Appeals appears to have rested its conclusion at least in part on the trial court's failure to observe the children's behavior in the defendant's presence and its failure to explore less restrictive alternatives to the use of the one-way closed circuit television procedure. Although we think such evidentiary requirements could strengthen the grounds for use of protective measures, we decline to establish, as a matter of federal constitutional law, any such categorical evidentiary prerequisites for use of the one-way television procedure. The trial court in this case, for example, could well have found, on the basis of the expert testimony before it, that testimony by the child witnesses in the courtroom in the defendant's presence "will result in [each] child suffering serious emotional distress such that the child cannot reasonably communicate," § 9-102(a)(1)(ii). So long as a trial court makes such a case-specific finding of necessity, the Confrontation Clause does not prohibit a State from using a one-way closed circuit television procedure for the receipt of testimony by a child witness in a child abuse case.

*Id*. at 860 (citations omitted).

Although not cited by either McDonald or Respondent, Cumbie v. Singletary, 991 F.2d 715 (11th Cir. 1993), involves circumstances similar to this case. In Cumbie, the

defendant was charged with capital sexual battery and, before his trial, the prosecutor

sought to have the five-year-old victim, Cathy, testify by one-way closed circuit

television.  Cumbie, 991 F.2d at 717.

> The court held a brief evidentiary hearing on the motion during which a
> mental health counselor who had worked with the child was a witness.
> The counselor spoke generally about Cathy's personality and reaction to
> her alleged abuse and the events that followed.  (Tr. 81-84) When asked
> if she thought Cathy would suffer at least moderate emotional trauma or
> harm if required to testify in open court – the approximate language of Fla.
> Stat. § 92.54(1) (1987) – the counselor answered in the affirmative.  No
> other evidence was presented.

Id. at 717-18 (footnotes omitted).  The state trial judge granted the motion finding, "I will

allow the child to testify by closed circuit TV because I find that there is a likelihood that

she would suffer at least moderate emotional or mental harm from testifying in open

court."  Id. at 719.  After the jury convicted Cumbie of a lesser included offense, he

appealed to the First DCA, which affirmed his conviction but remanded for

resentencing, discussing the merits of only the sentencing issue and stating it found "no

merit to the remaining issues." Id.; Cumbie v. State, 539 So. 2d 538 (Fla. 1st DCA

1989).  In his federal habeas corpus petition, Cumbie argued "as he did on direct

appeal, that his right to confront adverse witnesses was infringed when Cathy was

permitted to testify by way of the one-way closed circuit television outside his

presence." Cumbie, 991 F.2d at 718.  Because the U.S. Supreme Court decided Craig

while Cumbie's habeas case was pending, the federal magistrate judge asked the

parties to address the impact of Craig on the case.  Cumbie, 991 F.2d at 719.  The

magistrate ultimately concluded Craig applied to Cumbie's case; the state trial court

erred because it did not make sufficient findings to overcome Cumbie's right to face-to-face confrontation as required by Craig; even if Craig did not apply, the trial court's findings did not satisfy Coy v. Iowa, which was decided after Cumbie's trial but before his conviction was final; and, even though the state trial court committed constitutional error, that error was harmless; therefore, Cumbie was not entitled to habeas corpus relief. Cumbie, 991 F.2d at 719.

On appeal, the Eleventh Circuit explained that "[t]he Sixth Amendment to the federal constitution guarantees that 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" Id. at 720. Further, the Eleventh Circuit explained that, in Coy, the Court held that "the 'irreducible literal meaning' of this clause guaranteed a defendant face-to-face confrontation with his accusers, even in child abuse cases.'" 991 F.2d at 720. The Coy case concerned an Iowa statute that allowed the trial court to place "a screen between the defendant and the accusing child abuse victim/witnesses, based on a statutory presumption that the screen was necessary to protect the children from the traumatic effect of testifying in court," and the Supreme Court found that procedure violated the Sixth Amendment right to face-to-face confrontation, noting that "the screen 'was specifically designed to enable the complaining witnesses to avoid viewing appellant as they gave their testimony,'" although appellant could "dimly observe the witnesses." Id. at 720-21.

In applying Coy, the Cumbie court analyzed the Florida statute involved in this case, section 92.54, providing for closed circuit televised testimony for child victims in certain cases. Id. at 721. The court indicated that the first part of the statute, in

subsections (1) through (3), "contemplates that the defendant and child may be in the same room during the child's testimony" and noted that "[o]f course, when the defendant and the child are in the same room during the child's testimony, the defendant's right to face-to-face confrontation is not a concern." *Id*. The second part of the statute, however, allows the court to require the defendant to remain in the courtroom and watch the child testify on the television. *Id*.; *see* § 92.54(4), Fla. Stat. (2003). As the Eleventh Circuit observed, "[t]here is no indication in the statute as to when the defendant must remain in the courtroom or what separate judicial findings are a necessary prerequisite to such action." Cumbie, 991 F.2d at 721. The court further observed:

> Clearly, section 92.54(4) affects the defendant's confrontation rights. The procedure appears "specifically designed to enable the complaining witnesses to avoid viewing [the defendant] as they [give] their testimony." Coy, 487 U.S. at 1020 . . . . When the defendant is forced to sit in the courtroom and watch a child testify against him via one-way closed circuit television, "[i]t is difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter." Id.

> The question, then, is whether the state trial court in this case made sufficient individualized findings about the possibility of harm to Cathy to reliably conclude that it was necessary for her to testify outside of Cumbie's presence and overcome the "irreducible literal meaning" of the Confrontation Clause.

*Id*. at 721-22.

The Eleventh Circuit agreed with the district court that the state trial court had failed to make sufficient findings "to defeat Cumbie's right to a face-to-face encounter as it was understood after Coy" and observed that "[n]o one at trial even appears to

have considered Cumbie's Confrontation Clause rights." *Id*. at 722.  The court noted

that the State's motion "did not mention the necessity, nor even request, that Cathy

testify outside the presence of the defendant." *Id*.  The Eleventh Circuit explained,

"There is no reference in the record to the necessity or propriety of keeping Cumbie

from the room in which Cathy testified, or the harm that would be avoided by allowing

Cathy to testify in that manner." *Id*. at 719.  In addition,

> There was no discussion whatsoever during the brief hearing on the
> state's motion about whether there would be a danger of significant
> traumatization to Cathy if Cumbie stayed in the courtroom during her
> testimony.  Cathy's counselor did not mention anything about Cathy's
> feelings toward Cumbie or whether Cumbie's presence in the room with
> Cathy might make it more or less likely that she would become upset or
> suffer trauma.

*Id*. at 722.  The court determined the trial court's mere recitation of the "magic words,"

without the inquiry and case-specific findings required by <u>Coy</u>, did not satisfy

constitutional standards:

> Even if we assume that a court after <u>Coy</u>, but before <u>Craig</u>, would
> not have known that the specific inquiry and findings necessary to
> overcome the defendant's right to face-to-face confrontation must actually
> be relevant to that right, we are still convinced that the trial court's inquiry
> and findings were constitutionally deficient in this instance. . . .
>
> We simply cannot find any support in the record for the proposition
> that the state demonstrated, or the trial court properly articulated, any
> reason to justify Cathy's separation from the defendant during her
> testimony.  There is nothing to indicate that she was afraid of Cumbie or
> that testifying by closed circuit television would enhance the protection
> she needed.  Rather, the inquiry in this case was little more than the
> legislative presumption of harm rejected by the Court in <u>Coy</u>.  The motion,
> hearing, and findings in this case appear from the record to have been
> merely a rote exercise to conform with the formality of section 92.54,
> although we are not convinced the court's findings were even sufficient to
> satisfy the statute.  To read the more relaxed standard of Justice

> O'Connor's concurrence in <u>Coy</u> and its requirement of a "case-specific finding of necessity," *Id*., compels the conclusion that a mere recitation of the "magic words" is not enough to override the defendant's constitutional rights.  There still must be a "close examination of 'competing interests'" that warrants subordinating the constitutional preference for face-to-face confrontation.  <u>Coy</u>, 487 U.S. at 1024 . . . .  No such examination was conducted in this case.

*Id*. at 722-23 (some citations omitted).  The court noted that Justice O'Connor, in her concurring opinion in <u>Coy</u>, had cited the Florida Statute, section 92.54(4), "as a statute that might be adequate to satisfy constitutional scrutiny" but indicated "that dicta might have lulled some into a false sense of security."  *Id*. at 723.  "Most obviously, section 92.54(4), on its face, does not require any showing whatsoever to justify keeping the defendant in the courtroom while the child testifies by television from another room."  *Id*.  Further, "even if the statute did comply with Justice O'Connor's understanding of constitutional acceptability, the trial court must still sufficiently examine and apply the statute to protect the defendant's rights" as "[a] statute that is facially constitutional does not always guarantee that a particular defendant's rights are adequately protected by it."  *Id*.  In <u>Cumbie</u>, where the trial court merely recited the operative statutory language, the court found such "does not strike us as the sort of 'specific findings of fact, on the record, as to the basis for its ruling' contemplated by the statute."  *Id*.  The court found the trial court's "mere recitation of the statutory language" did not comply with section 92.54(5), which requires the trial court to make specific findings of fact, and even if it did fulfill the statute's requirements, "the procedure did not in this case adhere to the constitution."  *Id*.  The court found, "[W]e do not believe that the state trial court's factual finding that Cathy would be harmed by testifying in court was sufficiently developed at

the hearing or that it was fairly supported by the scant record." *Id*. Therefore, that

determination was not entitled to a presumption of correctness as "[t]he record simply

does not sustain the assertion that Cathy would have suffered such a degree of trauma

as to make it necessary for her to testify outside Cumbie's presence." *Id*. at 723-24.

The court found the state court proceeding "did not comport to the constitutional

standard mandated by Coy" and, further, the error was not harmless in that case. *Id.* at

724.

In this case, similar to Maryland v. Craig and Cumbie v. Singletary, the child

victim, T.W., testified by closed circuit television, under oath, was subject to full cross-

examination, and was observed as she testified, by the judge in person and the jury and

defendant on the video camera in the courtroom. Both the prosecutor and defense

counsel, as well as defense counsel's paralegal, were also in the room with T.W.

Before allowing T.W.'s testimony in this fashion, in compliance with Craig's first

requirement, the trial court heard testimony from Dr. Knobbe, reviewed the CPT tape,

and determined the use of the one-way closed circuit television procedure was

necessary to protect the welfare of T.W., given T.W.'s age, family relationships, limited

understanding of the court, and the nature of the testimony she would give. *See* Doc.

25 Ex. B at 37-38.

As to Craig's second requirement, the state trial court found, at the conclusion of

the motion hearing, that "there is a substantial likelihood that [T.W.] would suffer at

least moderate emotional or mental harm due to – if she's required to testify *in the*

*presence of the defendant* in open court." Doc. 25 Ex. B at 38 (emphasis added). This

finding thus specifically references the presence of McDonald, not just the courtroom generally, in connection with the substantial likelihood that T.W. would suffer harm. McDonald cites to Dr. Knobbe's testimony, quoted above, that T.W. was not afraid of McDonald, for his argument that the record does not sufficiently support the state trial court's finding that T.W. would suffer harm if required to testify in McDonald's presence. *See* Doc. 1 at 16; Doc. 25 Ex. B at 23 (prosecutor asked whether "in addition to the anger that she talked about, did she express any feelings of fear or trepidation or being afraid of Mr. McDonald if she had to see him face-to-face?" and Dr. Knobbe answered, "She did not"). Other portions of Dr. Knobbe's testimony, however, do support the state trial court's conclusion regarding the substantial likelihood that T.W. would suffer harm if required to testify in McDonald's presence. In particular, Dr. Knobbe testified that he met with T.W. for "[a]pproximately an hour" and he believed that time was sufficient for him to make a determination within a reasonable degree of psychological certainty, regarding whether T.W.'s appearance in court, in a face-to-face confrontation with McDonald, would cause a substantial likelihood of mental or emotional damage. *Id*. Doc. 25 Ex. B at 20. Dr. Knobbe discussed T.W.'s age, her close relationship with her mother, and her limited understanding of the court proceedings. *Id*. at 21-23; *see id.* at 27-29 (testimony of Dr. Knobbe on cross). In addition, Dr. Knobbe testified regarding T.W.'s behavior when asked about testifying in McDonald's presence in the courtroom:

> Q . . . . Describe for us the way that [T.W.] behaved whenever you approached the issue of having to confront Mr. McDonald here in the courtroom.

A  Oh, she would stand very straight, her expression, her facial expressions became much more flat, or as you would say sort of difficult to read, and she became very intent on doing – doing something.  Either she was printing letters on a piece of paper, or at one point she removed the video that was in the – that was playing in the TV set and switched to another video.

Q Okay.

A In essence, just about anything other than responding to the question.

Q And if confronted, then, in a face-to-face situation with her accuser, would you expect that to be a less intensive reaction or a more intensive reaction?

A I would expect a more intensive reaction, again along those lines of trying to avoid having to think about, deal with, respond to the situation.

Q And just to wrap up, after your hour-long, or approximately hour-long meeting with her, it's your expert opinion, to a reasonable degree of psychological certainty, that [T.W.] would suffer at least a substantial likelihood of mental or emotional harm, at least moderate mental or emotional harm if she were forced to confront Mr. McDonald here in open court?

A Yes.

*Id*. at 26.  Dr. Knobbe testified that his opinion was based, not only on T.W.'s statement that she would feel anger toward McDonald, but on the totality of his testimony, all the information he had, as well as his "concern about her ability to provide the Court with complete information."  *Id*. at 35.  This testimony supports the trial court's findings, including that "there is a substantial likelihood that [T.W.] would suffer at least moderate emotional or mental harm" if required to testify in McDonald's presence.  The trial court's finding thus complies with <u>Craig</u>'s second requirement.  *See* <u>Craig</u>, 497 U.S. at 860 ("The trial court in this case, for example, could well have found, on the basis of the

expert testimony before it, that testimony by the child witnesses in the courtroom in the defendant's presence 'will result in [each] child suffering serious emotional distress such that the child cannot reasonably communicate,'" and "[s]o long as a trial court makes such a case-specific finding of necessity, the Confrontation Clause does not prohibit a State from using a one-way closed circuit television procedure for the receipt of testimony by a child witness in a child abuse case."); Lomholt v. Iowa, 327 F.3d 748, 754-55 (8th Cir. 2003) (affirming denial of habeas relief and explaining, among other things, the U.S. Supreme Court "requires a showing of trauma, not necessarily a showing of fear" and "[f]ear, shame, guilt, and countless other emotions may overwhelm a child victim's ability to communicate").

As to Craig's third requirement, again, the state trial court found "there is *a substantial likelihood that she would suffer at least moderate emotional or mental harm due to* – if she's required to testify in the presence of the defendant in open court." Doc. 25 Ex. B at 38 (emphasis added).  This finding is more than the de minimis harm required by Craig.  *See* Myles v. State of Fla., 602 So. 2d 1278, 1281 and n.4 (Fla. 1992) (explaining "[t]he Craig requirements are not precisely the same as those provided in the child-witness statute" and that "[t]o be valid, the trial court's inquiry, findings, and order thus must comply with all the requirements of Craig and the statute," and noting "[m]oderate harm would satisfy the 'more than de minimis' requirement of Craig").

Notably, although the Cumbie court applied Coy, and not Craig, and Cumbie was decided pre-AEDPA, the Cumbie court's observations provide some additional

guidance for the resolution of McDonald's claim.  *See* <u>Bell v. Cone</u>, 535 U.S. 685, 693

(2002) (explaining AEDPA "modified a federal habeas court's role in reviewing state

prisoner applications in order to prevent federal habeas 'retrials' and to ensure that

state-court convictions are given effect to the extent possible under law").  As the

<u>Cumbie</u> court indicated, the statute at issue, section 92.54(4), Florida Statutes,[2] does

not, on its face, require "any showing whatsoever to justify keeping the defendant in the

courtroom while the child testifies by television from another room."  991 F.2d at 723.

Although the trial court here, like the trial court in <u>Cumbie</u>, recited the statutory

language in granting the State's motion, the court here also made some case-specific

findings of necessity referencing T.W.'s age, T.W.'s "limited understanding of the court

and the nature of the testimony that is to be elicited from her," T.W.'s family situation,

and the court's observation of T.W. on the CPT videotape.  In addition, unlike the trial

court's finding in <u>Cumbie</u>, the trial court's findings in this case specifically referenced

"the presence of the defendant."  *Compare* Doc. 25 Ex. B at 38 *with* <u>Cumbie</u>, 991 F.2d

at 718; *see supra* n. 2.  And, unlike the State's motion in <u>Cumbie</u>, the State's motion

here asserted T.W. "will suffer at least moderate emotional or mental harm *due to the*

---

[2]Although section 92.54(1), Florida Statutes (2003), which was applied in
McDonald's case, was amended after 1987 (the version that applied in <u>Cumbie</u>), to
include "due to the presence of the defendant" if the child is required to testify in open
court, subsection (4) of the statute is substantially the same in both the 2003 and 1987
versions to the extent it provides: "During the child's testimony by closed circuit
television, the court may require the defendant to view the testimony from the
courtroom.  In such a case, the court shall permit the defendant to observe and hear
the testimony of the child, but shall ensure that the child cannot hear or see the
defendant."  The 2003 version also includes, in addition to child victim, "person with
mental retardation."

*presence of the Defendant* if the victim is required to testify in open court." Doc. 25 Ex.

A at 23 (emphasis added); *see supra* n. 2. Further, as set forth in detail above, the

record here was more than the "scant record" in <u>Cumbie</u>. *Id*. at 4-10. Indeed, in

contrast to the situation in <u>Cumbie</u>, the record reveals that McDonald's Confrontation

Clause rights were considered and the trial court made sufficient findings to defeat his

right to a face-to-face encounter with T.W.

Based on the foregoing, McDonald has not demonstrated that the state court's

adjudication of his Confrontation Clause claim resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established U.S. Supreme Court

precedent; or that was based on an unreasonable determination of the facts in light of

the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Accordingly, this ground should be denied.

In the remaining grounds, Grounds 2 through 8, McDonald alleges IAC

concerning trial counsel. In <u>Strickland</u>, the U.S. Supreme Court adopted a two-part test

for such claims:

> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel
> was not functioning as the "counsel" guaranteed the defendant by the
> Sixth Amendment. Second, the defendant must show that the deficient
> performance prejudiced the defense. This requires showing that
> counsel's errors were so serious as to deprive the defendant of a fair trial,
> a trial whose result is reliable.

466 U.S. at 687. To demonstrate ineffectiveness, a "defendant must show that

counsel's performance fell below an objective standard of reasonableness." *Id.* at 688.

To demonstrate prejudice, a defendant "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

If a state prisoner's habeas petition "includes a claim that has been 'adjudicated on the merits in State court proceedings,' § 2254(d), an additional restriction applies." Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011). The federal court may not grant relief unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen, 131 S.Ct. at 1398 (quoting Harrington v. Richter, 131 S.Ct. 770, 786 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)). This Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1388.

For this Court's purposes, importantly, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'" Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Schiro v. Landrigan, 550 U.S. 465, 473 (2007)). "And, because the Strickland standard is a

general standard, a state court has even more latitude to reasonably determine that a

defendant has not satisfied that standard." *Id.* It is a "doubly deferential judicial review

that applies to a <u>Strickland</u> claim evaluated under the § 2254(d)(1) standard." *Id.*

### Ground 2: IAC - Failure to "Move to Nol Pros or Discharge the Petitioner of an Unlawfully Amended Information" and Trial Court Lacked Jurisdiction

In Ground 2, McDonald asserts his trial counsel was ineffective for failing to

move to nol pros or discharge him of an unlawfully amended information. Doc. 1 at 5.

McDonald further asserts the trial court had no jurisdiction to proceed and enter

judgment and sentence. *Id.* McDonald indicates he was arrested on July 10, 2003,

and the information was filed on July 17, 2003, charging him with capital sexual battery

in Count 1, a violation of section 794.011(2)(a), Florida Statutes, and lewd or lascivious

battery in Count 2, a violation of section 800.04(4)(a), Florida Statutes. *Id.* On March

31, 2004, the morning of trial, the State amended the information by replacing the

charge in Count 2 with lewd or lascivious molestation, a first degree felony in violation

of section 800.04(5)(b), Florida Statutes. *Id.* McDonald argues this amendment was

unlawful because it was after the 175-day speedy trial period and did not correct an

error in the existing charge, but substituted a new and different charge based on the

same criminal conduct. *Id.* McDonald argues the entire information was invalidated by

the unlawful amendment. *Id*. at 6. McDonald asserts trial counsel erred and "was

grossly negligent for failing to protect the petitioner's constitutional rights as the trial

court had no jurisdiction to proceed to trial and enter judgment or sentence without a

valid charging document." *Id*. McDonald asserts he raised this claim in his Rule 3.850 motion. *Id*.

Respondent indicates McDonald raised, in his amended Rule 3.850, a claim that trial counsel was ineffective for failing to move for a "nol pros or discharge" because the trial court lacked jurisdiction to proceed on the charges after the information was unlawfully amended. Doc. 25 at 51. Respondent points out that McDonald there cited Florida Rule of Criminal Procedure 3.191(a) and State v. Anderson, 537 So. 2d 1373 (Fla. 1989), in support of his claim. *Id*.; *see* Ex. NN at 6. Respondent explains that the state post-conviction trial court summarily denied this claim and the First DCA affirmed the decision without a written opinion. Respondent argues McDonald has not raised a federal constitutional claim; rather, he has raised a state speedy trial claim. Doc. 25 at 52-53.

Respondent further argues that trial counsel cannot be found ineffective for failing to raise a frivolous claim. *Id*. at 54-55. The State argued in its response to McDonald's Rule 3.850 motion, that under Florida Rule of Criminal Procedure 3.140(j), the State may amend the information at any time prior to trial because of a formal defect and, here, the amended information did not infringe on McDonald's speedy trial rights because the original information was filed within the speedy trial time period. *Id*. at 56. The state post-conviction trial court found the State's response correct and adopted the State's argument. *Id*. The court further found the only amendment was to the age of the victim in Count II and designating the correct subsection under 800.04, and the amended information properly related back to the original information. Id.

Respondent argues the amended information did not charge a new or previously

uncharged crime – that the punishment was increased does not change the fact that

the crime was charged in both informations – and trial counsel had no basis to move for

discharge or dismissal of the amended information.  *Id*. at 58.

In reply, McDonald argues this claim involves both an IAC claim and a

fundamental or plain error claim.  Doc. 43-1 at 12 [ECF page #s].  He argues he never

waived his speedy trial rights.  *Id*.  He further argues he was entitled to have the

unlawfully amended information dismissed because it charged a new and different

crime, which increased the permissible punishment and level of offense, after the 175-

day speedy trial period had expired.  *Id*. at 13-18.  McDonald also argues the state court

unreasonably applied Strickland to the undisputable facts in the record.  *Id*. at 19.

McDonald raised this claim as his first ground in his amended Rule 3.850 motion.

*See* Doc. 25 Ex. NN at 4-8.  As Respondent indicates, the state post-conviction trial

court summarily denied the claim, adopting the State's response which provided:

> The defendant initially claims that trial counsel was ineffective for failing to move for a discharge or nolle prosequi on the Amended Information because the trial court had no jurisdiction to proceed on those charges.  The defendant claims the charging document was a nullity, his conviction is void, and he is entitled to immediate release.

> On July 17, 2003, the State charged the defendant under a two count Information with the following offenses: Sexual Battery on a Child under 12 Years of Age by Defendant 18 Years of Age or Older, a capital offense under § 794.011(2)(a), Florida Statutes; and Lewd or Lascivious Battery, a second degree felony under § 800.04(4)(a), Florida Statutes (see attached original Information).  The factual basis for these offenses is contained within the responding deputy's initial report (see attached probable cause affidavit).  According to the deputy's report, the defendant

made the victim suck on his penis, telling her to suck on it like a popsicle, and subsequently touched her vagina with his hand.

On March 29, 2004, several days before trial, the State filed an Amended Information (see attached Amended Information). While the language contained within the first count remained virtually the same, the subsection designated in count two changed. The Amended Information charging the defendant with committing Lewd of [sic] Lascivious Molestation, a first degree felony under § 800.04(5)(b), Florida Statutes.

The reason for the amended information becomes clear with a review of Section 800.04, Florida Statutes. Section 800.04(4)(a) provides "[a] person who engages in sexual activity with a person *12 years of age or older but less than 18 years of age* commits lewd or lascivious battery, a felony of the second degree" (emphasis added). Section 800.04(5)(b) prohibits similar conduct with a victim who is *less than 12 years of age*. It is clear from the victim's trial testimony that she was less than 12 years of age at the time of the offenses (TT. 179). Thus, while the Amended Information did increase the possible range of punishment for the defendant's conduct as it relates to count two, the Amended Information corrected an error relating to the age of the alleged victim. The victim could not be both under the age of 12 years for count one and over the age of 12 years for count two. The prosecutor recognized this mistake, and corrected it prior to trial.

Florida Rule of Criminal Procedure 3.140(j) allows the State to amend an Information at any time prior to trial because of a formal defect. The Amended Information also did not infringe on the defendant's speedy trial right as the Amended Information linked to the original Information, which was filed well within the speedy trial time period. See Fla. R. Crim. P. 3.191; State v. Clifton, 905 So. 2d 172 (Fla. 5th DCA 2005).

The State's Amended Information was in accord with the law, and trial counsel cannot be deemed ineffective for failing to move for dismissal. As such, he has failed to satisfy either prong of the Strickland standard. Issue one should be summarily denied by the court without a hearing.

Doc. 25 Ex. at 80-82; *see id.* Ex. SS at 331. In addition to adopting the State's

response, the state post-conviction trial court made these findings:

To the extent Defendant argues there was fundamental error, this is not cognizable on a 3.850 claim because fundamental error may be raised on direct appeal.

As to failure to preserve error or failure to move to dismiss the Amended Information, the Court adds: The original Information charged Count II Lewd or lascivious molestation; so did the amended charge on Count II, all under Section 800.04. The only amendment was the age of the victim, and designating the correct subsection under 800.04. It is inconsequential legally that this upgraded the charge to a felony of the first degree. Generally, it is not even necessary to designate the degree of the charge or that it is a felony. Rule 3.140(k)(6) and (7). As to the statutory cite, "error in or omission of the citation shall not be ground for dismissing the count . . . if the error or omission did not mislead the defendant to the defendant's prejudice." Rule 3.140(d). The error alleging victim's age in Count II was obvious on the face of the Information. The Information on its face charged two sex crimes of the same victim on the same day and year. However, the allegation regarding the age of the child in Count I conflicted with her age stated in Count II. TW, the victim, was only 5 years old at the trial. (Jury tr. 41) Obviously, there is no procedural prejudice, as there is nothing the Defendant could do to dispute the child's age being under 12 years old on 7/10/03, the date the crimes were committed, which date remained unamended. Defendant misunderstands the nature of the prejudice which cases and the rules refer to. Improper prejudice is that which misleads the defense in its preparation of the case, not that which convicts Defendant. The Amended Information properly related back to the original Information filed 7/18/03. The trial court would have denied any motion to dismiss amended Count II or the Amended Information. Therefore, there was no IAC. (Information; Amended Information)

Doc. 25 Ex. SS at 331. This ruling, affirmed on appeal without opinion, is entitled to

deference and review is limited to the record before the state court. *See* Cullen, 131

S.Ct. at 1388.

Nothing indicates the state court's adjudication of this claim resulted in a decision

that was either (1) contrary to, or involved an unreasonable application of, clearly

established U.S. Supreme Court precedent, or (2) based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). The record contains the original information and the amended information. *See* Doc. 25 Ex. A at 5 (Information filed July 18, 2003), 30 (Amended Information filed March 31, 2004). As the state post-conviction trial court found, both documents charge two sex crimes involving the same victim, T.W., occurring on the same day. In the original information, however, the allegations regarding T.W.'s age in the first count conflicted with those allegations in the second count. The amended information corrects this conflict. As the post-conviction trial court found, McDonald suffered no prejudice by this amendment. The court also found any motion to dismiss the amended information would have been denied; accordingly, there was no IAC. Moreover, to the extent McDonald's claim rests on state law grounds, it is not sufficient to warrant review or relief by a federal court. *See, e.g.*, Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). This ground should be denied.

### Ground 3: IAC – Incapacity of Counsel Due to Head Injuries

In Ground 3, McDonald argues trial counsel was ineffective due to incapacity from his head injuries. Doc. 1 at 7. McDonald asserts that counsel informed him and the trial judge that, on the day before trial, counsel had suffered seizures and injured his head. *Id*. Counsel indicated he was fine but also said he was "experiencing some lightheadedness" and "may require more comfort breaks" than usual. *Id*. McDonald asserts that counsel's "inability to function completely is evident where counsel repeatedly erred in recalling what witnesses had said to him during trial" and the trial judge "had to reprove counsel for his rambling and illogical cross-examination of the

state's key witness, T.W." *Id*. McDonald asserts counsel's negligently proceeded to trial, provided ineffective assistance, and prejudiced the defense by "his impaired ability to intelligently argue the case and subject the state's evidence to zealous and meaningful adversarial testing." *Id*. McDonald argues that if counsel had accepted the court's offer of a continuance, the outcome of the proceeding may have been different. *Id*. McDonald indicates he raised this claim in his Rule 3.850 motion. *Id*.

Respondent argues McDonald waived this claim during the course of his state post-conviction proceedings. Doc. 25 at 59. Respondent points out that the state post-conviction trial court held an evidentiary hearing on this claim on June 16, 2008; however, at the hearing, McDonald refused to present any testimony, despite being warned that the failure to do so would result in a waiver of the claim. *Id*. Respondent further argues that, even if the claim was revived when the state court allowed McDonald to file an amended Rule 3.850 motion, the evidentiary hearing had occurred and McDonald had abandoned the claim. *Id*.

On the merits, Respondent asserts McDonald has not established trial counsel was ineffective, and McDonald cannot establish deficient performance or prejudice. *Id*. at 63-64. Respondent explains that the State post-conviction trial court adopted the State's response to this claim in the Rule 3.850 proceeding, and the court also made additional findings. *Id*. at 64-66. Respondent argues the record supports the state court's determination, and McDonald is not entitled to relief. *Id*. at 66.

In reply, McDonald argues he did not abandon this issue in the state courts, he did raise it on appeal, and he is not procedurally defaulted or barred from raising it in

this proceeding.  Doc. 43-1 at 20.  McDonald asserts a full and fair evidentiary hearing

was never held, and the state court unreasonably applied Strickland when it denied

relief without an evidentiary hearing. *Id*.  McDonald argues that "[w]ithout the testimony

of counsel's doctor regarding the seizures and head injuries counsel sustained one day

before trial, the court could not have reasonably concluded that counsel's

representation involved reasonable professional judgment." *Id*. at 20-21.  McDonald

submits that counsel's head injury "was or may have been responsible for at least four

episodes of confusion during trial," and counsel himself admitted "he was operating in a

diminished capacity." *Id*. at 21.  McDonald asserts that his "acceptance of counsel's

self-evaluation before trial began, and before counsel's errors and deficiencies caused

petitioner to lose confidence in counsel's capacity to effectively represent him, meant

nothing." *Id*.  McDonald requests a full and fair evidentiary hearing on this claim. *Id*. at

22.

McDonald raised this in his second claim in his amended Rule 3.850 motion filed

in state court.  *See* Doc. 25 Ex. NN at 8-9.  In the Rule 3.850 proceeding, the State filed

the following response, adopted by state post-conviction trial court in denying relief:

> In his second claim, the defendant asserts that trial counsel was
> ineffective because of the incapacity he suffered as a result of head
> injuries.  The defendant states that counsel's ineffectiveness is clear on
> the face of the record.  The defendant points to three instances in which
> counsel erred in recalling a witnesses's testimony, one place in which the
> court informs counsel that he is all over the place when examining the
> victim, and one place in which counsel states he must be losing his train
> of thought.
>
> Prior to trial, a short sidebar discussion was conducted between the
> court, the prosecutor, trial counsel, and the defendant (TT. 14-16). Trial

counsel informed the court that he had suffered two mild seizures the day before during a medical procedure, and one of these seizures had caused him to hit the back of his head (TT.15). Trial counsel told the court that he felt fine, may have to ask for a few more comfort breaks, but nevertheless was in full capacity and capable of handling the case (TT. 15). The trial court inquired as to whether this was satisfactory with the defendant, and he responded, "yes, sir" (TT. 15). Trial counsel also had discussions with the defendant and his family prior to trial about the seizures (Defendant's exhibit A). It was the defendant's decision to proceed to trial despite the court's apparent agreement to continue the trial if necessary.

The trial transcript selections cited by the defendant are few and far between, and certainly are not a fair representation of defense counsel's overall trial performance. The defendant has also not linked these instances of claimed ineffectiveness with the seizures and head injury suffered by defense counsel the day before. The defendant's claim that trial counsel may have had a financial motivation to quickly dispose of the defendant's case is totally irrelevant to this issue and speculative at best.

Doc. 25 Ex. OO at 82-83. The state post-conviction trial court made further findings, in

denying this ground:

This Court adds: an evidentiary hearing is not a forum granted to defendants to simply explore the possibilities of IAC. In a 3.850 motion, "*First*, the defendant *must* allege facts that would *support a conclusion* that his lawyer's performance was deficient". (emphasis added.) **Vathis v. State**, 859 So.2d 517, 518 (Fla. 1st DCA 2003), review dismissed 887 So. 2d 1290 (Fla. 2004). No trial court should have to unnecessarily disrupt its duty to manage defendants with current charges to dispose of fishing expeditions for *possible* IAC. . . .

Here, Defendant's allegations that his attorney had been seriously ill the day before, or on the day of trial, do not support a conclusion that defendant was deprived of the constitutional right of counsel. This is especially so when the attorney himself addressed the Court and reassured the Court he felt fine enough to proceed and the court properly inquired. (Jury tr. 14-16) The record itself shows counsel was reasonably effective throughout the trial. (Jury tr. 1-347) Brief lapses in memory or trains of though by counsel usually occur [in] trials, regardless of the cause. *Defendant points to nothing that his lawyer did, or did not do, regardless of the cause, that was prejudicial to such an extent that*

*Defendant was deprived of his constitutional right to counsel.* **Vathis**, *supra*.

By the same token, assuming the truth of fact that Defendant's lawyer had financial problems (legal or otherwise), this claim of fact does not logically justify a conclusion that counsel was ineffective. Reasonable attorneys can argue whether counsel's performance here was less than ideal from time to time during the trial. But, defense counsel did nothing, nor omitted anything, that was so important that it rose to a level that justifies a conclusion that counsel was constitutionally ineffective. No evidentiary hearing is justified or necessary to confirm or explain a conclusion of IAC that is not logically deduced from the Defendant's allegations. Alleging possibilities and taking leaps of logic, is not enough. (Trial tr. 1-346). See **Vathis**, *supra*.

Doc. 25 Ex. SS at 332. This ruling, affirmed on appeal without opinion, is entitled to

deference.

The state court's determination is supported by the record. Specifically, a review

of the record reflects that defense counsel informed the judge, opposing counsel, and

McDonald of his health issue before the trial started, and McDonald indicated he

agreed with defense counsel proceeding:

MR. EAGEN: Your Honor, Mr. McDonald and Mr. Allman are aware of this. Yesterday, as I informed the Court previously, I had a medical procedure that I did, and during that procedure I unfortunately had two mild seizures and hit the back of my head during one of them. And I told Mr. Allman that I would make him aware of any problems this morning. I just wanted the Court to be aware of the situation. And I woke up this morning not – you know, I mean I felt fine. But I do – I am experiencing some lightheadedness. I am drinking water at the table, and I may request more breaks of the, you know, comfort breaks than I normally would. And I wanted the Court to be aware of that.

THE COURT: That's fine.

MR. EAGEN: And if for some reason I do feel ill, I will try to – I don't want the jury to be aware of any of this.

THE COURT: That's fine with me. And this is satisfactory with you, Mr. McDonald?

THE DEFENDANT: Yes, sir.

THE COURT: Okay.

MR. EAGEN: He is aware of it, and I just didn't want to – I wanted at least for you to be aware of it.

THE COURT: But you feel you are, at the present time capable of –

MR. EAGEN: At the present time, I feel like I'm in full capacity and capable of handling the case.

THE COURT: Okay. Fair enough.

MR. EAGEN: But I did want the Court to be aware, if something unusual should happen, I did not want the Court to be unaware of what the cause of that was.

THE COURT: That's fair enough, sir. I appreciate that.

MR. EAGEN: Thank you, sir.

Doc. 25 Ex. B at 14-16. Thus, McDonald was aware of defense counsel's condition and agreed to proceed with the trial.

In his amended Rule 3.850 motion, McDonald cites to pages 52, 201, 217,and 260 of the trial transcript in support of his assertion that defense counsel's "inability to function completely as counsel is evident where counsel repeatedly erred in recalling what witnesses had said to him during trial." *Id*. Ex. NN at 8 nn.15-16. The first instance occurred in the cross-examination testimony of D.P, T.W.'s mother, during the pre-trial hearing on the State's section 90.803(23) motion to have child hearsay statements admitted:

Q Okay. You were aware at the time that they [McDonald and his wife, D.P.'s older daughter, and their two children] came down that there had been a prior incident up in – or there was an incidence of domestic violence up in Virginia where [S.M., McDonald's wife] was arrested, weren't you?

A Yes, I'm aware of that.

Q And that Mr. McDonald had to have her arrested?

A That's correct.

Q And you weren't too happy about that, were you?

A Well, it was something that I got involved in only because of her calling me. But I mean no, I wasn't happy about the –

Q You were angry about it, right?

A No, I wasn't angry. It's nothing that any mother would wish upon their child.

Q Okay, of her being arrested, right?

A No, I wasn't angry about her being arrested. No, that's not true.

Q What were you angry about?

A I wasn't angry.

Q You just said you were.

MR. ALLMAN: I don't –

BY MR. EAGEN:

Q Okay, scratch. I thought I heard you say you were angry.

A No.

Q So you had no anger towards Mr. McDonald for having your daughter arrested?

A No.

Doc. 25 Ex. B at 51-52. It is not clear from this excerpt whether defense counsel merely confused the witness's answer of not being "happy" with being "angry" or whether defense counsel may have been trying to get the witness to admit to being angry. Regardless, it does not appear to be ineffective assistance.

The second instance cited by McDonald occurred during defense counsel's cross-examination of T.W. during the trial:

Q Were you playing in the – in a room with air conditioning or not? Was it – was it cool in the room where you were, or not?

A I don't know.

Q No? No what? You don't remember if it was an air conditioner?

A (Shaking head.)

Q Were you in the den?

A Huh?

Q I'm sorry?

A (No oral response.)

Q Just one moment.

(Phone conversation between defendant and attorney.)

BY MR. EAGEN:

Q What room – When you were playing with [K.] and [M.], okay, what kind of – what kind of room was that?

A In my room.

Q You were playing in your room.  Okay.  And does your room have an air conditioner?

A No.

Q Were you hot that day?

A Yes.

Q Yeah.  It was hot in the house, right?

A Yes.

Q Okay.  You never remember playing in a room with a couch in it or anything?

A No.

Q No?  Okay.  Now, when you were playing in your room with [K.] and [M.], right, what happened when you were playing with [K.] and [M.] in your room?

A My mom tell us to clean up.

THE COURT: Why don't you get down to a specific timeframe, Mr. Eagen. You're all across the board here with this child.

MR. EAGEN: I'm trying – I'm trying to keep the conversation open, Your Honor.  I'm trying to get it centered.  Okay.

BY MR. EAGEN:

Q [S.M.] and Michael and [K.] and [M.] came to visit in July.  Do you remember?

A Yes.

Q Okay.  And they stayed with you for a few days, right?

A Yes.

Doc. 25 Ex. B at 200-02. This instance of the trial judge advising defense counsel to

"get down to a specific timeframe" does not reflect deficient performance of counsel. It

appears counsel was trying to see what details T.W. remembered about the day these

events occurred and asking T.W. questions, after conferring with McDonald. This fits

with defense counsel's apparent strategy of focusing on any inconsistencies in T.W.'s

account. *See, e.g., id.* Ex. C at 297 (defense counsel's first closing argument: "The

things I do want to point out, though, about the tape is the inconsistencies as to what

room, rooms, this alleged incident might have occurred in. It started out there was a –

in the bathroom, brushing her teeth; and then it went to her brother's room, and her

brother's room was mentioned several times; and then it went to the living room; and

then in when to the room where Mr. McDonald and his wife were sleeping. And so the

child was talking about several different rooms, all over the place, and even Ms. Ellis

stated in her testimony that she could not ever really lock down the room.").

The third instance cited by McDonald also occurred during defense counsel's

cross-examination of T.W. during the trial:

> Q Okay. [T.W.], in the movie that day that you were there along with
> Michael [McDonald], remember, and you saw that movie on the TV, right?
>
> A Uh-huh.
>
> Q Did you see a lady doing what you said Michael asked you to do? Did
> you see a – Did you see a lady doing that to another man?
>
> A No.
>
> Q I'm sorry?
>
> A No.

Case No. 4:10cv428-RH/CAS

Q No?  You saw naked people on the TV though, right?

A Yes.

Q What were they doing, these naked people?

A I don't know.

Q Were they kissing?  You know what kissing is, right?  Were they kissing?

A I don't know.

Q Were they touching each other with their hands?

A Yes.

Q Yes?  Or no?  I couldn't hear.

A Yes.

Q Okay, yes.  Okay.  That's better.  Thank you, [T.W.].  You're doing real good.  Okay.  Do you know if the lady on the – on the TV, in the movie, ever was sucking the man in that place where you drew on the drawing?

A No.

Q Yes?  Okay.

THE COURT: She said no.

BY MR. EAGEN:

Q Oh, I'm sorry.  Sorry.  You said no?

A Yes.

Q Okay.  Yes, you said no. . . .

Doc. 25 Ex. B at 216-17.  This does not reflect deficient performance.  Rather, it

appears defense counsel was simply having difficulty hearing the witness answer the

question, as he indicated after her response just before this instance. Notably, another

similar instance occurred a little before this, also during defense counsel's cross-

examination of T.W., where defense counsel, from the written record, actually heard the

answer correctly:

> Q Okay. And did you play – And then what did you play? Were you still playing dolls, or where you playing school?
>
> A School and dolls.
>
> Q School and dolls, okay.
>
> THE COURT: She didn't say school, counsel. She said dolls.
>
> MR. EAGEN: I thought she said school and dolls.
>
> THE COURT: No, you said school and dolls.
>
> MR. EAGEN: Oh, I'm sorry. I misheard then. I thought she said school and dolls.
>
> BY MR. EAGEN:
>
> Q Okay. So you didn't play school?
>
> A (Shaking head.)
>
> Q Is that right?
>
> A Yes – No.
>
> Q No, okay. You just played dolls?
>
> A (No oral response.)
>
> Q Right?
>
> A Yes.

Doc. 25 Ex. B at 206-07.

The final instance cited by McDonald occurred during defense counsel's cross-

examination of Leshone Davis, the neighbor:

Q Okay, so you would have gotten the police involved?

A Exactly. Correct.

Q And you didn't think to advise [D.P., T.W.'s mother] to do that?

A No, I didn't think she just – As the person that I knew [D.P.]? No, I
wouldn't feel that she just angry and cut the fool, no. As I know her, that
she would have just called the police, as that's what she had did.

Q I understand that, but you didn't advise her to call the police?

A No, not at all. We didn't talk about it.

MR. EAGEN: May I have a moment, Your Honor?

THE COURT: Sure.

(Discussion between defendant and attorney.)

BY MR. EAGEN:

Q Ms. Davis, earlier you said that you thought that the child – that the
children were dropped off at your place around 2:00 or midmorning –

MR. ALLMAN: Objection. That's not what she said.

THE COURT: No.

BY MR. EAGEN:

Q I'm sorry, I didn't understand your answer to that. Could you tell me
approximately what time you thought the children were dropped off at your
home?

A It was, like I say, it was between 2:30 or 3:00 o'clock, close to about that
time.

Q Okay.  Could it have been earlier?

A No, it was about that time because they had asked – when they was getting ready to go pick up Ms. [D.P.], and it was like about close to probably about 5:00 o'clock when they came back, so I know it was about 2:30 or 3:00 o'clock.

Doc. 25 Ex. C at 260-61.  Again, this does not reflect deficient performance.  Indeed, a review of Davis's testimony on direct indicates her testimony about the time she was asked to watch the children was a bit unclear, and she did mention "towards the morning":

Q . . . Now, on July 10th of 2003, did anyone bring over some children for you to mind?

A Yes.

Q And who was that?

A That was [S.M.] and Michael McDonald.

Q Okay.  Do you remember what time that was?

A It was between 3:00 o'clock – something between about 3:00 to – about 2:30 to 3:00 o'clock.  I know it was like in the afternoon, close to the – you know, towards the morning.

Q Okay.  Midafternoon?

A Yes, something like that.

Doc. 25 Ex. C at 237-38.  Therefore, defense counsel's question on cross was not improper and did not constitute deficient performance.

Based on the foregoing, McDonald has failed to establish that the state court's determination is contrary to or an unreasonable application of United States Supreme Court precedent.  Accordingly, this ground should be denied.

## Ground 4: IAC – Failure to Object to and Move to Exclude
## Impermissible Cumulative Hearsay

In Ground 4, McDonald argues there are four instances of impermissible

cumulative hearsay presented at trial, without objection by defense counsel, in the

following witnesses' testimony and evidence:  (1) D.P., T.W.'s mother; (2) Leshone

Davis, neighbor; (3) Kimberly Ellis, CPT investigator; and (4) the CPT video-taped

interrogation of T.W.  Doc. 1 at 8.  McDonald argues an objection to this hearsay would

have been sustained because none of the testimony was necessary as T.W. testified at

trial, and the prejudicial effect of the testimony far outweighed the probative value as it

allowed "multiple, repetitive hearsay witnesses to improperly bolster the credibility of the

alleged victim." *Id*.  The admission of the video "forensic interview" was testimonial in

nature and violated McDonald's right to confrontation because McDonald was not

present during questioning and had no opportunity to cross-examine T.W.  *Id*.

McDonald asserts that without this prejudicial testimony, the outcome of the proceeding

may have been different.  *Id*. at 9.

As to the merits, Respondent argues that McDonald has not established that trial

counsel was ineffective and he cannot establish the state court's ruling was contrary to

or an unreasonable application of controlling U.S. Supreme Court precedent.  Doc. 25

at 71.  Respondent indicates the state post-conviction trial court adopted the State's

response to this claim as presented in McDonald's Rule 3.850 proceeding, and quotes

that response.  *Id*. at 72-74.  Respondent argues the record supports the state court's

determination, the testimony was admissible under Florida law, and McDonald has cited

no U.S. Supreme Court precedent to the contrary. *Id*. at 74.

In reply, McDonald adopts all arguments from his state court filings. Doc. 43-1 at

22. He cites Crawford v. Washington, 541 U.S. 36 (2004), in support of his argument

that the admission of the CPT video of T.W. violated his rights under the Confrontation

Clause. *Id*. at 23. McDonald argues counsel was ineffective for failing to object to this

as well as to the testimony of D.P., Ellis, and Davis. *Id*. McDonald argues all this

testimony was admitted under section 90.803(23), which requires specific findings of

reliability that the trial court did not make. *Id*. at 23-24. McDonald argues that "[u]nder

Florida law, the inadmissible hearsay would have been excluded upon a motion to do

so" and, therefore, "there is a reasonable probability that, absent counsel's errors, the

result of the trial would have been different." *Id*. at 26. McDonald concludes that the

state court thus unreasonably applied Strickland, and requests this court grant de novo

review and hold a hearing on this ground. *Id*.

McDonald raised this as the third claim in his amended Rule 3.850 motion filed in

state court. *See* Doc. 25 Ex. NN at 9-14. As Respondent explains, in denying this

claim, the state post-conviction trial court adopted the State's response, which stated:

> In his third claim, the defendant asserts trial counsel was ineffective
> for failing to object to inadmissible cumulative hearsay. The defendant
> claims there are four instances of impermissible hearsay admitted without
> objection from trial counsel: [1] testimony of [D.P.]; [2] testimony of
> Leshone Davis; [3] testimony of Kimberly Ellis; and [4] the admission of
> the video interview of the victim conducted by Ms. Ellis.
>
> [1] [D.P] testified at a pretrial hearing on the State's Notice of Intent
> to Introduce Child Hearsay Statements (TT. 40-57). She testified that the

victim was very nervous and scared when the victim related the incident (TT. 46-47). The victim told [D.P.] that the defendant touched her "down there" and "made her suck his thing like a popsicle" (TT. 47).

On one hand, the defendant claims [D.P.'s] testimony is impermissible hearsay that trial counsel did not object to, and then later claims that trial counsel did object to the admission of [D.P.'s] testimony. The record reveals that trial counsel did in fact object to the admissibility of [D.P.'s] testimony (TT. 60). Trial counsel argued against the admissibility of child hearsay by attempting to show [D.P.'s] bias towards the defendant. Trial counsel cannot be deemed to be ineffective simply because the trial judge ruled against his objection or because the defendant believes trial counsel should have been more strenuous in his objection on the issue (TT. 60-61).

It also bears noting that [D.P.'s] testimony was not admitted under the excited utterance exception to the hearsay rule found in section 90.803(2), but rather under the child hearsay exception found in section 90.803(23). The defendant's reliance on Pressley and Idaho v. Wright is therefore misplaced. See Pressley v. State, 968 So. 2d 1039 (Fla. 5th DCA 2007) (victim's statements to mother not admissible under excited utterance exception because the victim had time for reflection before making the statements); Idaho v. Wright, 497 U.S. 805 (1990) (trial court erred in admitting victim's statements made to a pediatrician under Idaho's residual hearsay exception).

[2] Trial counsel conceded the admissibility of Leshone Davis's testimony (TT. 14). Leshone Davis only testified at trial (TT. 235-263). Ms. Davis testified that the victim had told her that the defendant made the victim go down on him by putting his privacy in her mouth, and spitting on his hand before putting it inside her (TT. 239-240). Ms. Davis testified that the victim was scared when she related this incident to Ms. Davis (TT. 241).

Ms. Davis's testimony was admissible under the child hearsay exception found in Section 90.803(23). The State did not attempt to admit her testimony under the excited utterance exception. Sufficient safeguards of reliability were presented at trial allowing Ms. Davis's testimony to be admissible as to the victim's disclosure to her. Trial counsel cannot be deemed ineffective for failing to object to testimony that was otherwise admissible.

[3] The defendant claims that Kimberly Ellis's testimony and the admission of the Child Protection Team (CPT) video were impermissible under the Confrontation Clause, and the medical diagnosis and treatment exception under Section 90.803(4).  Trial counsel did not object to the admissibility of the CPT video (TT. 11-12, 130-131).  The CPT video was admitted and published to the jury during Ms. Ellis's testimony (TT. 128-179).

Jones is inapposite. In Jones, the Florida Supreme Court held that statements by the victim identifying the abuser were inadmissible under the medical diagnosis and treatment exception found in Section 90.803(4).  State v. Jones, 625 So.2d 821 (Fla. 1993). The State did not admit the victim's statements to Ms. Ellis under this exception, but rather under the child hearsay exception found in Section 90.803(23).

The defendant cites Contreras to support his argument that statements made to CPT forensic interviewers are per se violations of the confrontation clause.  Contreras v. State, 910 So.2d 901 (Fla. 4th DCA 2005). However, Contreras was a case in which the victim *did not testify*. In the case *sub judice*, the victim was available and did testify at trial.

The defendant's reliance on Allison is likewise misplaced because the child in Allison was a witness to a crime, not a "victim" under Section 90.803(23). Allison v. State, 661 SO.2d 889 (Fla. 2d DCA 1995). The child's testimony in Allison did not meet the requirements found in Section 90.803(23). In the case *sub judice*, the victim's statements, memorialized on the CPT video, met the requirements of Section 90.803(23) and qualified as child hearsay.

The CPT video was properly admitted during Ms. Ellis's testimony as child hearsay under Section 90.803(23) as sufficient safeguards of reliability were presented at trial. Trial counsel cannot be deemed ineffective for failing to object to testimony that was otherwise admissible.

[D.P.'s] testimony, Ms. Davis's testimony, Ms. Ellis's testimony and the CPT video were properly admitted under the child hearsay exception to the hearsay rule.  Thus, the defendant's cumulative error claim must also fail. See Bryan v. State, 748 So. 2d 1003 (Fla. 1999) (cumulative error argument must fail if allegations of individual error are found to be without merit).

The defendant has failed to show deficient performance, and that but for these deficiencies the result of the trial would have been different. The court should summarily deny issue three without an evidentiary hearing.

Doc. 25 Ex. OO at 83-86. This ruling, affirmed on appeal without opinion, is entitled to

deference.

The trial court's determination is supported by the record. Specifically, regarding

the testimony of D.P., trial counsel did object during the pretrial hearing on the State's

motion to admit child hearsay statements pursuant to section 90.803(23). *See* Doc. 25

Ex. B at 13, 60. Defense counsel challenged the admissibility of D.P.'s testimony:

I would oppose the mother of the child, and – based on the factor that – due to the prior domestic – One of the factors that the Court can consider is the prior – is there is a domestic dispute between the parties. And in this particular case, there's a long outstanding history of disharmony within this family, especially from [D.P.] towards Mr. McDonald. She was against the marriage from the beginning because of the interracial marriage, and her animosity was visible towards Mr. McDonald throughout the period of time that he was – well, he is still married to his wife. So I think that's a factor that the Court should be cognizant of and could utilize in determining not to allow the statement to come in.

*Id*. at 13. After D.P.'s testimony during the hearing on the section 90.803(23) motion,

defense counsel again argued:

Well, Your Honor, I previously stated my objection, and I based it on the fact of the domestic relationship that may or may not have existed. Obviously I believe that the dynamics of the family will come out more at trial than they did at this brief moment in the proceeding, but I do believe that there – I think the other portions of the trial will show a difference in the family dynamics than what has been presented here. I think there is a genuine, if not dislike, I think there's a genuine indifference between [D.P.] and Mr. McDonald, whether based on the infidelity and the domestic violence arrest and the fact that he's white and she is of color. And based on that, we would request that it not come in, and we'll just stand on our previous objections.

*Id*. at 60. Therefore, contrary to McDonald's assertion, defense counsel did object to the admission of D.P's testimony. The trial court overruled that objection, however, and allowed the testimony under the child hearsay exception, as the post-conviction trial court explained.

As to the testimony of Leshone Davis, the trial court also admitted that testimony under the child hearsay exception. As the state post-conviction trial court found, that testimony was properly admitted as sufficient safeguards of reliability were presented at trial. Accordingly, defense counsel's failure to object was not IAC. Notably, from the record, defense counsel consulted with McDonald just before he indicated he would not object to that testimony:

> MR. EAGEN: . . . As far as the neighbor – Could I have one moment, Your Honor?
>
> THE COURT: Sure.
>
> (Discussion between defendant and attorney.)
>
> MR. EAGEN: As far as the neighbor, Ms. Davis, I'm well prepared. I had already anticipated that that was going to come in, Your Honor, because of the – and, you know, the nature of the statement, so I really don't have an argument as far as that is concerned.

*Id*. at 13-14. Similarly, concerning the testimony of Kimberly Ellis and the admission of the CPT video tape, the record supports the state court's determination that defense counsel's failure to object was not IAC.

McDonald has failed to establish that the state court's determination is contrary to or an unreasonable application of United States Supreme Court precedent. "Federal courts in habeas corpus proceedings do not sit to review state evidentiary questions

unless the alleged error is of such magnitude as to render the state court defendant's trial fundamentally unfair." Land v. Sec'y, Dep't of Corr., No. 8:04cv2524-T-27TGW, 2008 WL 816707, at *12 (M.D. Fla. Mar. 26 2008) (citing Estelle v. McGuire, 502 U.S. 62, 72 (1991)). Here, McDonald had the opportunity to cross-examine T.W., as well as D.P., Leshone Davis, and Kimberly Ellis, as all of these witnesses testified during the trial. The trial court admitted the testimony under section 90.803(23), and McDonald has not shown the court would have ruled differently if counsel had sought to exclude the challenged testimony on different grounds. See, e.g., Kuhns v. Sec'y Dep't of Corr., No. 2:08cv163-FtM-29SPC, 2011 WL 1085013, at *19 (M.D. Fla. Mar. 21, 2011) (opinion and order on § 2254 petition, rejecting petitioner's IAC claim concerning counsel's failure to object to child hearsay testimony from victim's mother and CPT member, explaining defense counsel intentionally did not seek to exclude testimony from CPT worker because, as matter of strategy, counsel wanted to use testimony to show inconsistencies with child's statements and, further, trial court admitted testimony under section 90.803(23) and petitioner failed to show court would have ruled differently if counsel had sought to exclude testimony under different grounds and, thus, petitioner could not establish prejudice). This ground should be denied.

### Ground 5: IAC – Failure to Contact and Present Expert Witnesses and McDonald's Wife as Fact Witness

In Ground 5, McDonald argues his trial attorney rendered ineffective assistance in failing to contact experts to determine the potential value of their testimony, failing to present expert witnesses to refute the State's allegations at trial, and failing to call

McDonald's wife as an important fact witness. Doc. 1 at 9. McDonald refers to this Rule 3.850 motion for "the complete details" as "[t]his was the most voluminous and complicated issue" he raised. *Id*. He indicates he supplied the names of six possible expert witnesses who could have refuted the State's allegations "with hard scientific evidence that proves [his] absolute innocence." *Id*. McDonald argues that counsel's decision to not even contact experts was not professionally reasonable and prejudiced the outcome of the trial by allowing the State's evidence to stand unopposed. *Id*. McDonald indicates defense counsel presented no witnesses at trial, instead relying on the perceived weaknesses in the State's case. *Id*. at 10. McDonald asserts he "was accused of acts involving the transfer of his serological DNA to the person and clothing of T.W., and digital penetration of a minor who was a medically verified virgin" and "[e]vidence of these allegations that would have been conclusively refuted by the FDLE analysis fo T.W.'s clothing, and the medical examination of T.W. should have been introduced by counsel through experts for purposes of impeachment and illustration of inconsistency." *Id*. The experts would have reviewed the evidence and allegations and "testified that, to a reasonable degree of professional certainty, the allegations were medically and scientifically impossible." *Id*. Experts could have also addressed the reliability of T.W. as a witness. *Id*. Finally, McDonald's wife was present and willing to testify "regarding instances where she observed her mother and neighbor telling T.W. what to say at about the alleged events." *Id*. at 11. McDonald argues that trial counsel's decision not to interview the potential witnesses was not objectively reasonable and could not have been an informed tactical decision. *Id*.

On the merits, Respondent asserts McDonald has not established trial counsel was ineffective under Strickland, and cannot establish the state court's ruling was contrary to or an unreasonable application of U.S. Supreme Court precedent. Doc. 25 at 79-80. Respondent indicates the state post-conviction trial court adopted the State's response to this claim as presented in McDonald's Rule 3.850 proceeding, and quotes that response as well as the additional findings the state court made. *Id*. at 80-86. Respondent argues the record supports the state court's determination, and McDonald has shown neither deficient performance nor prejudice. *Id*. at 86-88.

In reply, McDonald adopts his argument from the state court proceedings. Doc. 43-1 at 27. McDonald argues trial counsel had a duty, under prevailing professional standards, to conduct a thorough investigation, and counsel did not do that. *Id*. McDonald indicates that The Florida Bar considered his complaint concerning counsel's failure to investigate and consult with experts, and concluded that counsel's conduct was not acceptable. *Id*. at 31. The Florida Bar found McDonald's counsel's performance so far below its standards that it asked him not to take cases like McDonald's again. *Id*. at 32. The First DCA unreasonably applied Strickland where counsel's failures were not the result of adequate investigation. *Id*. at 34.

Except for the portion of the argument concerning The Florida Bar complaint, McDonald raised this as the fourth claim in his amended Rule 3.850 motion filed in state court. *See* Doc. 25 Ex. NN at 14-26. As Respondent explains, in its order denying this claim, the state post-conviction trial court adopted the State's responses

addressing (1) the medical witnesses, (2) the serological witnesses, (3) the

psychological witnesses, and (4) McDonald's wife, S.M.

Medical Witnesses

First, concerning the medical witnesses, the State's response, adopted by the

post-conviction trial court, provided:

> The defendant claims that trial counsel was ineffective for failing to call medical witnesses who would have refuted claims made by a state witness. At trial, the State called Lynn Steele, a nurse practitioner who works part time with the Child Protection Team (TT. 81-94). Ms. Steele testified that she has been declared an expert at least seven or eight times (TT. 84). Ms. Steele testified regarding an examination she conducted of the victim the day after the defendant committed the charge offenses. Ms. Steele testified that it is normal for her examinations to be unremarkable (TT. 87-88, 91-93, 94). Ms. Steele'[s] testimony indicated that she found no signs of trauma, injury, or pubic hairs that she could opine were evidence that a sexual act had occurred. Ms. Steele also stated that the lack of physical injury or evidence should not be used as evidence that nothing happened.

> The defendant asserts that trial counsel should have called Dr. Robert Fay and Dr. Edward Wiley to conclusively refute Ms. Steele's testimony. According to the defendant, these doctors could have demonstrated that it would be medically impossible for the victim's allegation to be true. The defendant further claims that these doctors would have testified that the alleged digital penetration of the victim's vagina would have ruptured her hymen. The defendant opines that the doctors' testimony would have created reasonable doubt in the jury's mind. The defendant further asserts that the two doctors were available to testify at trial.

> The issue of penetration was totally irrelevant to the prosecution of the defendant as to Count Two. The defendant was charged by Information with committing a Lewd or Lascivious Molestation on July 10, 2003, contrary to Section 800.04(5)(b), Florida Statutes (2002). Specifically, the Information alleged that the defendant touched the victim's breasts, genitals, genital area, or buttocks, or the clothing covering them in a lewd or lascivious manner. In his opening statement, the prosecutor noted that the defendant committed this crime by "rubbing

his fingers on her vaginal area after spitting on his fingers" (TT. 67). [D.P.] testified that the victim told her "he put spit on his finger and put it down in her vaginal area" (TT. 106). Ms. Ellis testified that the victim marked the vaginal area on the female drawing (TT. 162, 164). The victim also marked the vaginal area on another female drawing during trial (TT. 185, State's trial exhibit 4). Ms. Davis testified that the victim put her hand between her legs when she was showing Ms. Davis where the defendant touched her with is hands (TT. 240). In his closing argument, the prosecutor stated

> Mr. McDonald intentionally touched, in a lewd or lascivious manner, the breasts, genitals, genital area, or the clothing covering them, of [the victim]; and that Mr. McDonald was 18 years of age or older. Notice it makes no difference whether he touched her clothing or skin on skin.

(TT. 307). The prosecutor further argued that it does not make a difference whether the defendant touched her genitals or the clothing covering them (TT. 307). The prosecutor also stated that "the mere rubbing on the vagina is not going to leave bruises or marks" when he referenced Ms. Steele's testimony (TT. 314). Most importantly, the prosecutor never argued or presented testimony that there was digital penetration of the victim's vagina.

> Even assuming that trial counsel was ineffective for not calling these two doctors to refute Ms. Steele's testimony, the defendant cannot show that the outcome of the trial would have been different absent this deficient performance. There was no allegation of penetration during trial. Defense expert testimony regarding lack of physical signs of penetration would have been consistent with the State's case-in-chief in which it was argued that the defendant manually manipulated the victim's vaginal area. The State never claimed penetration occurred.

Doc. 25 Ex. OO at 87-89. The state post-conviction trial court made further findings

regarding the medical witnesses:

> Fay and Riley [sic], even if they would testify as Defendant alleges, there was no factual basis in the record upon which to base their opinion. Penetration was never alleged or argued. The Court would have disallowed their testimony as irrelevant and it risked misleading the jury or confusion of the issues.

*Id*. Ex. SS at 332-33.

Serological Witnesses

Second, the state post-conviction trial court adopted the State's response to

McDonald's Rule 3.850 claim concerning the serological witnesses:

> The defendant claims that trial counsel was ineffective for failing to call serological or DNA witnesses during the defense case.  At trial, the State called Lynn Steele (TT. 81-94). Ms. Steele testified regarding an examination she conducted of the victim the day after the defendant committed the charged offenses.  Ms. Steele testified that she did not know whether she took oral swabs from the victim because her report was marked "unknown" next to oral copulation (TT. 90). Ms. Steele further testified that
>
> > "[t]o the best of my knowledge, I did not swab the mouth because I was not told that there was a possibility of any oral copulation. I wrote "unknown" on the sheet.  I was told that there was ejaculation, so if there was ejaculation on any part of the body, I may have swabbed that area."
>
> (TT. 92-93).  Ms. Steele opined that she would not expect to find semen or public [sic] hairs in the mouth on the day following the assault, especially if the victim had drank or brushed her teeth. (TT. 93-94).
>
> Investigator Robbie Maxwell of the Gadsden County Sheriff's Office also testified regarding the subject of DNA (TT. 264-279). Investigator Maxwell testified that he sent the victim's clothing to the Florida Department of Law Enforcement (FDLE) crime lab for analysis and that there was no semen found on any of the clothing (TT. 274). Investigator Maxwell further testified that the only DNA found on the victim's underwear was from a female donor, but the lab could not match it to the victim because they did not have a specimen from the victim to compare it to (TT. 274).
>
> The defendant asserts that trial counsel should have called Dr. Kessis and Dr. Krane as witnesses. According to defendant, these doctors could have testified that it was scientifically impossible for the alleged ejaculation to have occurred.  The doctors could have shown that the allegations confirmed by CPT were false, could have testified as to the amount of DNA that need be present for testing to be accomplished, and

could have testified how long DNA can remain on specific items before it becomes unviable. The defendant further asserts that the two doctors were available to testify at trial.

Initially, it bears noting that trial counsel did make use of Ms. Steele's medical report and the results of the FDLE DNA analysis despite the defendant's argument to the contrary. Trial counsel could not admit Ms. Steele's report into evidence, and thus questioned her about it on cross-examination (TT. 88-93). Likewise, trial counsel could not have admitted the FDLE DNA analysis report into evidence, but Investigator Maxwell testified to its contents on cross-examination. (TT. 272-275).

There were no allegations at trial that the defendant had ejaculated on the victim or her clothing. Ms. Steele testified that she only would have swabbed areas if she thought there had been ejaculation. Investigator Maxwell testified that no semen or DNA belonging to the defendant was discovered on the victim's clothing. The doctors, even if called to testify, would not have added anything of substance that would have refuted this testimony or clarified it in any way. Even assuming that trial counsel was ineffective for not calling these two doctors, the defendant cannot show that the outcome of the trial would have been different absent this deficient performance.

Doc. 25 Ex. OO at 89-90. The state post-conviction trial court further found with respect to Dr. Kessis and Dr. Krane that, similar to the situation with the medical witnesses regarding lack of penetration, the testimony regarding impossibility of ejaculation was irrelevant because there was no testimony that McDonald ejaculated. *Id*. Ex. SS at 333.

Psychological Witnesses

Third, concerning the psychological witnesses, the State's response, adopted by the post-conviction trial court, provided:

The defendant claims that trial counsel was also ineffective for failing to call psychological witnesses during the defense case. At trial, the State called Kimberly Ellis from the Child Protection Team to testify

regarding her forensic interview of the victim (TT. 128-178).  A video of the forensic interview was published to the jury. (TT. 131-162).

The defendant asserts that trial counsel should have called Dr. McGowan and Dr. Crum as witnesses.  According to the defendant, these doctors could have been called to testify as to the unreliability, manipulation, and improper influence Ms. Ellis committed during the interview. The defendant suggests that Ms. Ellis conducted the interview in such a way that the victim answered the way she thought Ms. Ellis wanted her to answer rather than presenting what truly happened. The defendant also claims these witnesses could have testified to the presence and effects of Child Sexual Assault Accommodation Syndrome (CSAAS).

The two doctors could not have testified to CSAAS because it is inadmissible in Florida. Testimony regarding CSAAS cannot meet the Frye test for reliability because it had not been proven by a preponderance of scientific evidence to be generally accepted by a majority of experts in psychology.  See Hadden v. State, 690 So. 2d 573 (Fla. 1997).

The defendant fails to support his conclusion of improper conduct by Ms. Ellis with record cites as to where in the interview Ms. Ellis manipulated or improperly influenced the victim. While Ms. Ellis testified on cross-examination that she may have asked similar questions repeatedly, she testified she did so because children may be able to understand the question differently if it is phrased differently (TT. 166, 168). There is also no record evidence that the victim's testimony materially changed after her interview with Ms. Ellis. The victim's initial disclosure to Ms. Davis, her disclosure to her mother, her disclosure to Ms. Ellis, and her trial testimony are fairly consistent (TT. 105-106, 132-162, 184-187, 239-241).

Trial counsel did mention Ms. Ellis in his closing argument. Trial court [sic] stated "[t]here are things that the defense and I believe occurred on that tape as far as questions and repeated questions and attempting to get the child to respond in a manner, but I leave that up to your recollection" (TT. 297). Trial counsel cannot be deemed ineffective simply because the jury chose not to accept trial counsel's argument that Ms. Ellis's interview was improper.

The defendant's reference to the victim's testimony that her mother and Ms. Davis discussed the case with her, and the fact that it may

conflict with what other witnesses testified is irrelevant to the issue of how these psychologists' testimony could have affected the outcome of the trial.

Even assuming the defendant has established deficient performance on the part of trial counsel, he has not established that the outcome of the trial would have been affected by this deficiency.

*Id*. Ex. OO at 91-92. The court made additional findings:

[A]s to psychologists, Drs. McGowan and Dr. Crum, such testimony would have been disallowed for the reasons cited by the State in its Response. Assuming they would have made general even [sic] general observations, this was all within the common sense of the jury. Defense counsel competently argued this. It is not IAC to say counsel "could have done more." This is particularly true of expert opinion testimony as contrasted with testimony of fact witnesses. The tape itself was not out of the ordinary for such a case. This Court has never in 25 years had an attorney seek to present an expert on coaching. Nothing in this particular record made this uniquely required or advisable regarding the CPT interview in this case. On this matter, counsel was well within standards of practice. (Jury tr. 132-162).

*Id*. Ex. SS at 333.

<u>McDonald's Wife</u>

Fourth, concerning McDonald's wife, S.M., the State's response, adopted by the

post-conviction trial court, provided:

The defendant claims that trial counsel was ineffective for failing to call the defendant's wife, [S.M.], during the defense case. At trial, the defense did not present any witnesses.

The defendant asserts that trial counsel should have called [S.M.] as a witness to testify to contact between the victim and [D.P.]. The defendant speculates that [S.M.] could have testified to pretrial influence [D.P.] placed on the victim, and episodes of witness tampering perpetrated by [D.P.]. The defendant further speculates that [S.M.]'s testimony at trial would have led to the exclusion of [D.P.'s] testimony, Ms. Davis's testimony, and the victim's testimony. The defendant theorizes that the testimony would have been excluded as tainted and unreliable.

The defendant asserts that the State would have been left with only the CPT video as evidence, and that the video, standing alone, would have been insufficient to sustain a conviction. The defendant also asserts that [S.M.] was available and willing to testify at trial on the defendant's behalf.

The defendant's assertions in this subclaim are speculative and conclusory at best. The defendant does not state with specificity what pretrial influence and witness tampering were committed by [D.P.]. He also fails to establish how this influence and witness tampering altered testimony presented at trial. The defendant also fails to mention whether [S.M.] even observed this alleged pretrial influence and witness tampering. Interestingly, he also fails to mention that [S.M.] was responsible for turning the adult video over to law enforcement officers (TT. 270).

Furthermore, [S.M.] could not have testified to statements she overheard the victim or [D.P.] make. This testimony would have been excluded as hearsay. [S.M.]'s testimony also could not have been admitted under the prior inconsistent statement exception to the hearsay rule because its admission would not have been to impeach the testimony of either the victim or [D.P.].

Even assuming [S.M.] was able to testify, her proposed testimony would not have had the outcome envisioned by the defendant. [S.M.] would have been the last witness to testify, and would testify after the State had rested its case-in-chief. [S.M.]'s testimony therefore could not and would not have led to the exclusion of the testimony of [D.P.], Ms. Davis, and the victim.

Lastly, trial counsel made a tactical decision not to present [S.M.]'s testimony. Any minimal benefit of her testimony would have given was far outweighed by trial counsel's desire to maintain first and last closing arguments. This trial occurred in the spring of 2004, several years before the law changed giving the State first and last closing arguments.

The defendant has failed to establish that trial counsel was ineffective for not calling [S.M.] at trial. As such, his motion should be summarily denied as to this subclaim.

Ex. OO at 92-94.

These rulings, affirmed on appeal without opinion, are entitled to deference and are supported by the record. Specifically, as Respondent explains, regarding Dr. Fay and Dr. Wiley, the medical experts, there was no allegation that McDonald's finger penetrated the victim's vagina and, therefore, none of the proposed testimony McDonald points to was relevant.  Doc. 25 at 87.  Regarding the serological experts, Dr. Kessis and Dr.Krane, their proposed testimony was similarly not relevant because there was no allegation or evidence that McDonald ejaculated.  *Id*.; *see, e.g.*, Black v. Sec'y, Dep't of Corr., No. 3:08cv928-J-12TEM, 2011 WL 4424452, at *18 (M.D. Fla. Sept. 22, 2011) (rejecting, in report and recommendation, petitioner's IAC claim for failure to obtain medical witness and explaining "even if a medical expert had been called to testify concerning penetration, the state did not have to prove the element of penetration" and "[i]nstead, the state could simply put forth sufficient evidence to support a conviction based on the union with the sexual organs of the victim"). Regarding Dr. McGowan and Dr. Crum, as the state court determined, a large portion of the proposed testimony concerned Child Sexual Abuse Accommodation Syndrome and would not have been admissible under Florida law, which uses standard from Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), for novel scientific evidence.  *See* Hadden v. State, 690 So. 2d 573 (Fla. 1997) (holding that expert testimony concerning Child Sexual Abuse Accommodation Syndrome does not pass Frye test and "consequently, this evidence may not be used in a criminal prosecution for child abuse").

Concerning McDonald's wife's proposed testimony, as the post-conviction trial court found, such may have been harmful to McDonald given that his wife had retrieved

a pornographic tape and given it to the authorities. In addition, as the state court found,

if counsel had called McDonald's wife, or any of these witnesses, the defense would

have lost the final closing. Given the lack of physical evidence in this case, as well as

the circumstances detailed above regarding the potential effect of each witness's

testimony, such a trial strategy does not appear unreasonable. *See, e.g.*, Parker v.

Sec'y, Fla. Dep't of Corr., No. 3:09cv1203-J-34JRK, 2013 WL 104425, at *19 (M.D. Fla.

Jan. 9, 2013) (finding IAC claim concerning failure to call witness fails where, among

other things, "defense counsel was interested in securing the first and last closing

arguments pursuant to the law at the time of Parker's trial"); Beasley v. State, 18 So. 3d

473, 491-92 (Fla. 2009) ("[T]rial counsel prepared for a trial in anticipation that Beasley

might choose not to testify. When Beasley declined to testify, the defense strategically

decided not to present a defense case-in-chief to avoid relinquishing the primacy and

recency effect in the closing argument 'sandwich' or, in other words, the benefits

inherent in giving both the first and last closing argument. This was a reasonable

defense strategy based on the procedural rules in force at the time of trial."). That the

strategy did not prove successful does not mean counsel's performance was

ineffective. *See* Zamora v. Dugger, 834 F.2d 956, 959 (11th Cir. 1987) (explaining that

trial counsel's "tactical decision to employ an insanity defense may not have been

successful in retrospect, but Strickland v. Washington allows trial counsel great latitude

to conduct a defense").

Moreover, McDonald's allegations appear insufficient on this claim as he has not

presented evidence of actual testimony or any sworn affidavits of alleged testimony of

these witnesses.  "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit" and "[a] defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."  United States v. Ashimi, 932 F.2d 643, 650 (7th Cir. 1991); see, e.g., Tucker v. Sec'y, Dep't of Corr., No. 2:03cv470-FtM-4DNF, 2009 WL 890395, at *22 (M.D. Fla. Mar. 31, 2009); Jordan v. McDonough, No. 6:06cv1446-Orl-19KRS, at *5 (M.D. Fla. Jan. 7, 2008).

Finally, in his reply filed, McDonald points to the complaint he filed with The Florida Bar concerning defense counsel, and the outcome of that proceeding, in support of his IAC allegations in this ground.  See Doc. 43-1 at 78.  It does not appear that McDonald made this particular argument in the state post-conviction proceedings in connection with this claim.  In his amended Rule 3.850 motion, McDonald did argue in his "Conclusion" section that the letter from The Florida Bar concerning McDonald's formal complaint supported his IAC claims.  See Doc. 25 Ex. NN at 40.  He attached to that motion the Notice of No Probable Cause and Letter of Advice from The Florida Bar Grievance Committee.  Id. at 73.  The Notice, dated April 12, 2006, provides:

> The grievance committee, comprised of both non-lawyer and lawyer members, has found no probable cause in the referenced cause against you and the complaint has been dismissed.
>
> However, the committee wants to make it clear that its finding does not indicate that it condones your conduct in this matter.  While your conduct in this instance did not warrant formal discipline, the committee believes that it was not consistent with the high standards of our profession.  The committee hopes that this letter will make you more aware of your obligation to uphold these professional standards, and that you will adjust your conduct accordingly.

> The committee hopes that, as a result of this letter of advice, you will
> either refrain from handling criminal defense cases of the significance
> involved in the case of State vs. McDonald or will associate a lawyer of
> established competence and experience as co-counsel.
>
> This letter of advice does not constitute a disciplinary record against you
> for any purpose, and it is not subject to appeal by you.

*Id*. It is not clear that the state post-conviction trial court considered this particular

argument, however, as it was not addressed in that court's order; therefore, this

argument does not appear exhausted and is now procedurally barred. Further, even

considering the merits of the argument, it is not clear which particular conduct by

counsel formed the basis of the Notice. *See id.; see also id.* at 46-48 (letter dated

February 22, 2005, from defense counsel to The Florida Bar Assistant Discipline

Counsel); Doc. 41 Ex. TTT (The Florida Bar Inquiry/Complaint Form completed by

McDonald and dated November 21, 2004), Ex. UUU (letter dated January 2, 2004, from

defense counsel to The Florida Bar Chief Branch Discipline Counsel), Ex. VVV (letter

dated February 11, 2005, from The Florida Bar Chief Branch Discipline Counsel to

defense counsel). Further, the Notice indicates no probable cause was found, the

complaint was dismissed, counsel's conduct did not warrant formal discipline, and

counsel's disciplinary record was not affected. Doc. 25 Ex. NN at 73. Moreover,

findings or reports from a state disciplinary proceeding are not binding on

determinations of deficient performance in a federal habeas IAC claim. *See generally*

Roe v. Flores-Ortega, 528 U.S. 470, 479 (2000) (quoting and citing Strickland,

explaining "[p]revailing norms of practice as reflected in American Bar Association

standards and the like . . . are only guides" and "while States are free to impose

whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices").

Based on the foregoing, McDonald has failed to establish that the state court's determination is contrary to or an unreasonable application of United States Supreme Court precedent. This ground should be denied.

### Ground 6: IAC – Failure to Impeach State's Witnesses and Move to Exclude Their Testimony

In Ground 6, McDonald asserts his trial attorney failed to attack the inaccurate and inconsistent impeachable testimony of the State's witnesses, and failed to move to disqualify or exclude their testimony for contradiction and unreliability. Doc. 1 at 12. McDonald states his only defense is his actual innocence, that the alleged offenses never occurred and the allegations against him are not true. *Id*. The prejudice that resulted due to trial counsel's errors deprived McDonald of due process and a fair trial. *Id*. McDonald indicates he provided "voluminous examples of impeachable testimony, to which counsel should have objected, in his 3.850 motion." *Id*. McDonald asserts counsel was also ineffective for failing to question T.W.'s competency to testify as counsel failed to object to the trial court's legally inadequate, summary, non-specific findings of competency. *Id*. McDonald asserts trial counsel further erred when he was given an opportunity to object to the showing of the CPT tape to the jury and counsel actually supported showing it to the jury, contrary to any plausible trial strategy. *Id*.

McDonald argues counsel's failures caused him incalculable prejudice and, absent

such errors, the outcome of the trial may have been different.  *Id*. at 12-13.

On the merits, Respondent asserts McDonald has not established trial counsel

was ineffective under Strickland, and cannot establish the state court's ruling was

contrary to or an unreasonable application of U.S. Supreme Court precedent.  Doc. 25

at 93-94.  Respondent indicates the state post-conviction trial court adopted the State's

response to this claim as presented in McDonald's Rule 3.850 proceeding, and quotes

that response as well as the additional findings the state court made.  *Id*. at 94-97.

Respondent argues the record supports the state court's determination, and McDonald

has shown neither deficient performance nor prejudice.  *Id*. at 97.

In reply, McDonald adopts his argument from the state court proceedings.  Doc.

43-1 at 34.  McDonald argues trial counsel failed to object to, or counteract, "numerous

false statements by the state's witnesses."  *Id*. at 37.  The First DCA unreasonably

applied Strickland.  *Id*. at 39.

McDonald raised this as the fifth claim in his amended Rule 3.850 motion filed in

state court.  *See* Doc. 25 Ex. NN at 26-35.  As Respondent explains, in denying this

claim, the state post-conviction trial court adopted the State's response, which stated:

> In his fifth claim, the defendant asserts that trial counsel was
> ineffective for failing to expose numerous inconsistencies in the testimony
> of the State's witnesses, and for subsequently failing to move to disqualify
> or exclude their testimony.
>
> The defendant spends a majority of this issue claiming that trial
> counsel was ineffective for failing to question the victim's competency,
> and for failing to object to the trial court's finding of competency. The
> defendant quotes passages *ad nauseum* throughout the record in which

he claims the victim was not clear or confused or presented inconsistent testimony.

The victim was questioned by the court outside the presence of the jury to determine her competency. (TT. 76-80). Trial counsel was given an opportunity to cross-examine the victim and did so (TT. 79-80). The court determined that the victim was competent to testify at trial (TT. 80). The prosecutor also asked questions designed to further demonstrate the victim's competency at the beginning of his direct examination of the victim (TT. 179-182).

Claims involving the victim's competency should have been raised on direct appeal. The defendant is attempting to litigate an issue that is only cognizable on direct appeal by couching it in terms of ineffective assistance of counsel. This portion of issue five should be summarily denied.

While the defendant does an admirable job reading the entire trial transcript and documents generated in this case to expose inconsistencies, the exposed inconsistencies are largely immaterial and irrelevant for impeachment purposes.

The defendant claims that trial counsel was ineffective for failing to point out the inconsistencies in witness testimony regarding what the victim said the defendant made her do. Ms. Davis testified that the victim told her that the defendant made the victim go down on him by putting his "privacy" in her mouth (TT. 239). The victim stated in the CPT video that she referred to the defendant's penis as his "thing" (TT. 158). [D.P.] also testified that the victim told her that the defendant made her suck his "thing" like a popsicle (TT. 106). The victim also marked on a diagram what part of his body the defendant made her suck (TT. 187). While these statements and actions are not exactly identical, they are consistent. The defendant fails to realize that had trial counsel tried to impeach these witnesses with these differences, it would have required the jury to hear repeatedly that the defendant had the victim suck on his penis like a popsicle. Trial counsel was not ineffective for failing to questions about statements that were consistent, just not identical to one another.

The defendant next claims trial counsel was ineffective for [not] pointing out a date inconsistency between Ms. Davis's trial testimony and a written statement she provided to the Gadsden County Sheriff's Office. In her written statement, Ms. Davis indicated that the victim told her about an incident that happened between the victim and the defendant in May

(Defendant's exhibit D). At trial, Ms. Davis testified on cross-examination that the defendant had done it in April (TT. 249). The victim testified prior to Ms. Davis's testimony that the defendant had only done this one time in July (TT. 153). Again, the defendant has identified statements made by Ms. Davis that do not exactly match up. However, they are not wholly inconsistent, and even if deemed inconsistent, they are not inconsistent regarding a material fact. Had trial counsel attempted to clarify with Ms. Davis whether this prior incident had happened in April or May, he would have drawn additional attention to the fact that the charged offenses were not the first allegation of the defendant's inappropriate conduct towards the victim. Trial counsel did not want to dwell on this topic any more than he had to once the cat was out of the bag (TT. 248-249). Trial counsel also could not impeach the victim with this inconsistency because she had already testified, and he could not recall her as a witness in the defense case simply to impeach her. Lastly, and probably most importantly, trial counsel did point out this inconsistency to the jury in his closing argument (TT. 301-301).

The defendant next claims trial counsel was ineffective for failing to impeach [D.P.] with a claimed inconsistency between her written statement to law enforcement and her testimony at trial regarding her meeting with Ms. Davis on July 10, 2003. In her written statement, [D.P.] wrote that she had called Ms. Davis inquiring about her mail, and it was this call that led to her finding out about the victim's accusation (Defendant's exhibit F). At trial, [D.P.] testified that she got a call from Ms. Davis (TT. 102). Ms. Davis also testified at trial that she called [D.P.] on the telephone, not the other way around. (TT. 255-256). While [D.P.]'s two statements are inconsistent with one another, the inconsistency does not relate to a material fact. It is clear from both Ms. Davis's written statement and testimony, and [D.P.]'s written statement and testimony that the two women spoke on the phone on July 10, 2003, and Ms. Davis requested [D.P.] to come over to Ms. Davis's house in order for Ms. Davis to tell [D.P.] about the victim's allegations. It would not have served any purpose for trial counsel to have exposed this inconsistency, and his failure to do so did not affect the outcome of the trial whatsoever.

The defendant claims trial counsel was ineffective for failing to impeach Ms. Davis and [D.P.] on the issue of whether they had spoken to the victim about her proposed trial testimony. The defendant alleges that trial counsel should have impeached the two women with the victim's trial testimony, in which she stated the women had spoken to her about her testimony and told her what to say.

At trial, [D.P.] was asked whether she had spoken to the victim about the case since July 10, 2003. [D.P.] responded in the negative, stating "I don't talk to her about it" (TT. 107). Ms. Davis testified that she had spoken to the victim the day before trial and had told her to speak up (TT. 246). She further testified that she told the victim "[w]hatever they got to ask you, you tell them the truth. Don't hold it in you" (TT. 246-247). Ms. Davis stated that she did not tell the victim what to say (TT. 247). On cross-examination of the victim, trial counsel asked the victim if she had spoken about this incident with her mother. The victim responded in the affirmative (TT. 211). The victim also testified that she had traveled to court today with [D.P.] and Ms. Davis and that they had told her about the courtroom, to speak up, and talk loud (TT. 213). The victim responded "yes" to several questions posed by trial counsel relating to whether the women told her what to say, reminded her of what she said before, and that they told her what happened between her and the defendant (TT. 213-214).

Trial counsel could not have impeached [D.P.] with the victim's testimony because [D.P.] had testified before the victim testified. Trial counsel also could not have called [D.P.] in the defense case solely to impeach her. Trial counsel cannot be deemed ineffective for failing to impeach [D.P.]'s testimony with testimony that had not yet occurred. While trial counsel did not impeach [D.P.]'s testimony, he did reference his cross-examination of the victim on that issue in his closing argument. Trial counsel told the jury that the victim said she had discussed the case with her mom since July 10, 2003 (TT. 303).

Ms. Davis testified that she had spoken to the victim about coming to court and testifying in this case. Her testimony and that of the victim are consistent on that point. It is also apparent from the face of the record that trial counsel exposed these inconsistencies that existed between Ms. Davis's testimony and the victim's statements. Their appearance in the record also supports the assertion that trial counsel did in fact put these inconsistent statements before the jury. While trial counsel did not specifically ask Ms. Davis questions about the inconsistencies, he did point them out to the jury. In his second closing argument, trial counsel told the jury that Ms. Davis's testimony was "completely different" than what the child had testified (TT. 324). He also questioned her credibility by suggesting it was unusual for the first alleged incident of molestation to be mentioned for the first time on the second day of trial. (TT. 324).

The defendant also points out several inconsistencies in the victim's trial testimony that trial counsel apparently did not elaborate on.

The defendant believes trial counsel should have seized on these inconsistencies and apparently done more than he did with them. The mere fact that they appear in the record is evidence that trial counsel made sure these inconsistencies were put before the jury. Furthermore, trial counsel mentioned the victim's inconsistencies in closing argument:

> The things I do want to point out, though, about the tape is the inconsistencies as to what room, rooms, this alleged incident might have occurred in. It started out there was a – in the bathroom, brushing her teeth; and then it went to her brother's room, and her brother's room was mentioned several times; and then it went to the living room; and then it went the room where Mr. McDonald and his wife were sleeping. And so the child was talking about several different rooms, allover the pace [sic], and even Ms. Ellis stated in her testimony that she could not ever really lock down the room.

> What the child was wearing wasn't clear. At one point she was in bed clothes, brushing her teeth, and the vitamin, and then the next moment she's in regular clothes. And while we're on clothing, it is the defense's contention of what we heard in the film was that at no time did the child say that their [sic] clothes were removed. And I say that because you were given diagrams and pictures, but there is no testimony from the child concerning the – that neither she nor Mr. McDonald, in her allegations, or what the State is asking you to believe, or prove in this case, that they were ever naked.

(TT. 297-98).

Trial counsel did point out inconsistencies between each of the State's witnesses' testimony. While some of the witnesses were not pressed on the issue, trial counsel did mention these issues in his closing arguments. He cannot be deemed ineffective simply because the jury chose to believe the testimony presented by the State. Even assuming the defendant has shown deficient performance, this claim fails because the defendant has not shown but for this deficiency, the outcome of the trial would have changed.

Doc. 25 Ex. OO at 94-99.  The state post-conviction trial court adopted the State's

response finding it "meticulously, fully, and accurately, addresses this ground."  *Id*. Ex.

SS at 333.

These rulings, affirmed on appeal without opinion, are entitled to deference and

are supported by the trial transcript.  *See* Doc. 25 Exs. B and C.  Defense counsel drew

out, and pointed out in closing, discrepancies from the witnesses as to material

allegations, and did not perform deficiently.  This ground should be denied.

### Ground 7: IAC – Failure to Object to Prosecutorial Misconduct

In Ground 7, McDonald asserts his attorney failed to object to misconduct by the

prosecutor.  Doc. 1 at 13.  McDonald asserts that, during closing arguments, the

prosecutor repeatedly commented on and vouched for the credibility of the State's

witnesses, vilified McDonald, and knowingly and deliberately presented false and

misleading information to the jury.  *Id*.  McDonald indicates he included eleven (11)

examples of prohibited conduct by the prosecutor in his Rule 3.850 motion.  *Id*.

McDonald argues counsel should have objected to this misconduct and counsel's

failure to do so resulted in a complete miscarriage of justice.  *Id*.  McDonald argues

that, if counsel had objected, the outcome of the trial may have been different.  *Id*.

On the merits, Respondent asserts McDonald has not established trial counsel

was ineffective under Strickland, and cannot establish the state court's ruling was

contrary to or an unreasonable application of U.S. Supreme Court precedent.  Doc. 25

at 103-04, 107.  Respondent indicates the state post-conviction trial court adopted the

State's response to this claim as presented in McDonald's Rule 3.850 proceeding, and

quotes that response. *Id*. at 104-06. Respondent argues the record supports the state court's determination, and only one comment was marginally questionable. *Id*. at 106-07. None of the comments deprived McDonald of a fair trial, and McDonald had the opportunity to rebut the prosecutor's argument as he had the final closing. *Id*. at 107-08. Respondent concludes McDonald is not entitled to relief on this ground. *Id*. at 108.

In reply, McDonald adopts his argument from the state proceedings. Doc. 43-1 at 39. He asserts the prosecutor's comments were not fair comments and "took on additional prejudicial significance" because of the circumstances of the case: T.W.'s word against McDonald's, with no corroborating evidence. *Id*. at 40-41. McDonald argues the First DCA unreasonably applied Strickland. *Id*. at 43.

McDonald raised this as the sixth claim in his amended Rule 3.850 motion filed in state court. *See* Doc. 25 Ex. NN at 32-35. As Respondent explains, in denying this claim, the state post-conviction trial court adopted the State's response, which stated:

> In his sixth claim, the defendant asserts that trial counsel was ineffective for failing to object to prosecutorial misconduct. The defendant asserts the prosecutor committed misconduct by repeatedly making comments vouching for the credibility of the State's witnesses, and knowingly presenting false information to the jury.
>
> Essentially, the defendant argues that the prosecutor committed misconduct by arguing to the jury in his closing argument that the victim's testimony was more credible and for giving reasons why the jury could find her testimony to be credible. The prosecutor did make the comments the defendant complains about in his closing argument (TT. 304-323). None of the questioned prosecutorial comments rise to the level of prosecutorial misconduct. The comments, when read in the context with the remainder of the prosecutor's closing argument, are either fair responses to the issues raised by the defense in the initial closing argument or are fair comments based on the evidence at trial. The defendant attempts to suggest the prosecutor simply state

that the "defendant in this case is guilty," thereby implying the prosecutor gave his personal opinion to the jury. However, the context of that statement is as follows:

The defendant in this case is guilty of the crimes with which he is charged because he forced his four year old sister-in-law to suck his penis like it was a popsicle and because he digitally molested her with his fingers after spitting on them

(TT. 304-205). On the same page of the transcript, the prosecutor states that "I expect that the evidence showed just what I said that it would" (TT. 305). The prosecutor's comment on the defendant's guilt is based on the evidence at trial, not the prosecutor's personal opinion.

The defendant also asserts that prosecutorial misconduct exists because the record reflects at least four times when the prosecutor mentioned the word "credibility" (TT. 316, 317, 320). The prosecutor stated

If she were lying or if she were put up to lying by her mother because her mother doesn't like the defendant, wouldn't she have been trying to convey a different demeanor, a different affect, trying to please her mother? Yeah, yeah, he did it, this is what he did to me. And she would have come across in a much more forthright way than the way that she did. I submit to you that her difficulty in testifying to these things that she testified adds to her credibility. The fact that she told the same story to Leshone Davis, to her mother, to Kimberly Ellis at the Child Protection Team, and then to all of us here in court adds to her credibility.

(TT. 316). The prosecutor later stated "[t]he fact that there are some slight variations in the story adds to the credibility (TT. 317). The prosecutor also stated

Now the defense want [sic] to formulate some sort of attack, or make suggestions that, well, this means that she was coached or this means she was influenced in her testimony. Ladies and gentlemen, that's her little four year old mind trying to make sense of an unspeakable, depraved act. That's the kind of statement that would be, and in fact is, etched upon the mind of a little girl when something like what happened to [T.W.] happens. It's no wonder she kept

repeating it. That doesn't detract from her credibility; it adds
to it.

(TT. 320). These are all fair comments on the evidence and are not
examples of improper vouching of the witness's credibility. The
prosecutor's simple mention of the word "credibility" is not per se
prosecutorial misconduct, nor should the court treat it as such.

The defendant also asserts that the prosecutor made knowingly
false statements to the jury. To support this claim, the defendant initially
mentions the prosecutor telling the jury that the victim had made a prior
uncharged accusation of abuse (TT. 309, 318). While the defendant is
correct that the victim stated that the abuse only happened once, Ms.
Davis testified to the victim telling her it had happened previously (TT.
249). The prosecutor's comment in his closing argument is a fair comment
on Ms. Davis's trial testimony.

The defendant next claims the prosecutor committed misconduct
by telling the jury that no penetration had occurred (TT. 307, 314). The
prosecutor actually told the jury it didn't matter if penetration had occurred
because the law did not require penetration for the jury to convict the
defendant of Lewd or Lascivious Molestation. Even if the prosecutor's
comments could be read to suggest that he told the jury no penetration
had occurred, there is ample record evidence to support such an
assertion (TT. 67, 106, 162, 164, 185, 240, State's trial exhibit 4).

The defendant claims the prosecutor committed misconduct by
telling the jury that the defendant showed the victim an adult movie as a
"training tape" (TT. 318). Despite the defendant's protestations to the
contrary, there was record evidence that the victim had been shown an
adult video (TT. 105, 151, 158-160, 240). Investigator Maxwell also
testified that he seized an adult movie entitled "Who's Your Daddy?" from
the house in which the alleged abuse took place (TT. 267). The
prosecutor's reference to this adult video being a training tape is a fair
comment on the evidence presented at trial, specifically the testimony that
the defendant showed the victim a video, the title of the video, and the
testimony that the defendant made the victim suck his penis like a
popsicle.

The defendant also claims trial counsel was ineffective for failing to
object to the prosecutor's crowning example of misconduct: calling the
alleged offense an "unspeakable and depraved act" (TT. 320). The
defendant asserts that trial counsel should have objected to this example

of misconduct, and that it prevented the jury from focusing on the emotional aspect of the case instead of the facts presented at trial. This comment was the only comment made during the prosecutor's closing argument that arguably could be thought of to invoke emotion. The court would not have declared a mistrial had trial counsel objected to this singular comment. Furthermore, the comment did not materially contribute to the conviction, deprive the defendant of a fair and impartial trial, or be so inflammatory as to require a new trial. Spencer v. State, 645 So.2d 377 (Fla. 1994); Lopez v. State, 555 So.2d 1298 (Fla. 3d DCA 1990).

None of the comments referenced by the defendant are examples of improper prosecutorial misconduct. Thus, trial counsel cannot be deemed ineffective for failing to object to otherwise admissible [sic] comments made by the prosecutor. The defendant has failed to show both deficient performance and that there exists a reasonable likelihood that but for this alleged deficient performance, the trial's outcome would have been different.

Doc. 25 Ex. OO at 99-103. The state post-conviction trial court adopted the State's response on this ground finding it "fully and accurately addresses all the matters raised." Id. Ex. SS at 333.

The state court's rulings were affirmed on appeal and are entitled to deference. In Florida, both the State and the defense have wide latitude in closing arguments. See Ford v. State, 802 So. 2d 1121, 1129 (Fla. 2001). A review of this record does not indicate the prosecutor's comments, even if questionable, rose to such a level as to result in an unfair trial or deprivation of due process. See Darden v. Wainwright, 477 U.S. 168, 181 (1986) (finding that prosecutor's comments "undoubtedly were improper," but that was not enough for habeas corpus relief? as the question was whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process"). McDonald has not shown that counsel was deficient for failing

to object to the prosecutor's statements or that, absent those statements, the outcome of the trial would have been different. *See, e.g.*, <u>Land</u>, 2008 WL 816707 at *19. McDonald has failed to establish that the state court's determination is contrary to or an unreasonable application of Supreme Court precedent. This ground should be denied.

### Ground 8: IAC – Cumulative Effect of Trial Counsel's Errors

In Ground 8, McDonald asserts the cumulative effect of trial counsel's errors, together with counsel's failure to move for JOA, deprived him of effective assistance of counsel. Doc. 1 at 14. He asserts counsel's errors, presented in the other grounds, deprived him of his rights to due process, fair notice, fair trial, equal protection, and effective assistance of counsel. *Id*. at 15.

Respondent argues, as to the merits of this ground, that McDonald has not established trial counsel was ineffective, and cannot establish the state court's ruling on this ground was contrary to or an unreasonable application of controlling U.S. Supreme Court precedent. Doc. 25 at 113. Respondent points out that there is no such federal constitutional claim as a claim of cumulative error based on ineffective assistance and, therefore, the state court cannot have acted contrary to any U.S. Supreme Court authority. *Id*. at 113-14. Regarding the JOA motion, Respondent asserts no such motion would have been granted because T.W. testified McDonald put his penis in her mouth and rubbed her vagina with his finger; counsel is not ineffective for failing to make a motion that has no possibility of being granted. *Id*. at 116.

In reply, McDonald adopts his argument from the state court proceedings. Doc. 43-1 at 44. McDonald argues "[a] cumulative error claim does not necessarily

presuppose that all errors complained of are individually harmless, only that, in addition to specific analyses of the several errors, the court examines the effect of all the errors together," and further "[t]his doctrine is explicitly required by the Supreme Court's holding in Strickland." *Id*. As to the JOA, defense counsel did not make a JOA motion. *Id*. at 46-47. McDonald argues that "[b]ecause T.W. bore none of the medical signs of having been abused, which the allegations would have reasonably required, and no serological evidence was found on her clothing, the uncorroborated and unreliable testimony of T.W. is insufficient as a matter of law to overcome Petitioner's presumption of innocence and sustain his wrongful conviction." *Id*. at 48. McDonald concludes, therefore, the First DCA unreasonably applied Strickland. *Id*.

McDonald raised this as his seventh claim in his amended Rule 3.850 motion. *See* Doc. 25 Ex. NN at 35-41. The state post-conviction trial court denied this ground because it found the other grounds lacked merit. *Id*. Ex. SS at 333.

This Court should also deny this ground. As to the JOA argument, defense counsel did make a motion for JOA:

> MR. EAGEN: Your Honor, at this time we'd make a motion for dismissal based on a lack of or insufficient evidence to proceed to the jury. We'd like to base that motion on although the jury has heard testimony concerning the allegations in this matter, there is no evidence before the Court of actual physical acts done or as far as the – there is testimony concerning the physical act of spitting on the finger, but thee is no testimony or – or evidence to suggest either physical – actual evidence or eve testimonial evidence concerning the actual act of oral copulation. The only testimony that the jury had heard at this point is that the child repeatedly said, and through the hearsay statement, that "He asked me to suck it like a popsicle." And based upon that, we would seek a motion for judgment of acquittal.

Doc. 25 Ex. C at 281. Although McDonald evidently believes defense counsel either did not make a JOA motion or could have made a better argument, defense counsel's performance was not deficient because sufficient evidence was presented to the jury to support the necessary elements of each count. *See id.* Ex. B at 105-06, 139-50, 158, 191; Ex. C at 239-41; §§ 794.011(2)(a) (capital sexual battery) and 800.04(5)(b) (lewd or lascivious molestation), Fla. Stat. (2003).

As to the argument concerning cumulative error, the Eleventh Circuit has rejected such an argument in a § 2254 proceeding. *See* Forrest v. Fla. Dep't of Corr., 342 F. App'x 560, 565 (11th Cir. 2009) (explaining that "[t]he Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim" but "the Supreme Court has held, in the context of an ineffective assistance of counsel claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt" (quoting United States v. Cronic, 466 U.S. 648, 659 n.26 (1984))). Moreover, because each of McDonald's individual claims fail, the cumulative error claim likewise fails.

As demonstrated by the above analysis, the state post-conviction trial court's adjudication of McDonald's claims did not involve an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. This ground should be denied.

## Conclusion

Based on the foregoing, Petitioner McDonald is not entitled to federal habeas relief.  The § 2254 petition (Doc. 1) should be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Petitioner fails to make a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted).  Therefore, the Court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  The parties shall make any argument as to whether a certificate should issue by objections to this report and recommendation.

Leave to appeal in forma pauperis should also be denied.  See Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

## Recommendation

It is therefore respectfully **RECOMMENDED** that the Court **DENY** Petitioner's

§ 2254 petition (Doc. 1).  It is further **RECOMMENDED** that a certificate of appealability

be **DENIED** and that leave to appeal in forma pauperis be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on August 19, 2013.

S/  Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**